COLLINS ELECTRICAL COMPANY, INC., A CALIFORNIA CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7957–74.   Filed March 9, 1977.

*Oscar Budd Kleinfeld,* for the petitioner.
*Joyce Elaine Britt,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioner's Federal corporate income taxes for the fiscal years 1971 and 1972 as follows:

| | |
|---|---|
| Sept. 30, 1971.......... | $20,343.83 |
| Sept. 30, 1972.......... | 12,395.04 |
| Total.............. | 32,738.87 |

The only issue for decision is whether the Commissioner, pursuant to section 482,[1] and the regulations promulgated thereunder, erred in allocating interest income to petitioner for interest-free loans made to Del Monte Electric Co. during petitioner's fiscal years 1971 and 1972.

### FINDINGS OF FACT

Petitioner Collins Electrical Co., Inc. (hereinafter Collins or petitioner), was incorporated in 1949 under the laws of California for the purpose of operating a general electrical contracting business. At the time of filing its petition, petitioner maintained its principal place of business in Stockton, Calif. Petitioner filed its Federal corporate income tax returns for the fiscal years ended September 30, 1971, and September 30, 1972, with the Internal Revenue Service Center at Fresno, Calif.

At the time petitioner was incorporated, August J. Sanguinetti (hereinafter Sanguinetti) owned 60 percent of the stock and Henning J. Thompson (Thompson) and John Nomellini (Nomellini) each owned 20 percent of the stock. Sometime prior to Sanguinetti's death in 1966, the three owners of Collins executed a buy and sell agreement with respect to shares of stock owned by a deceased shareholder.

During the years in issue, Nomellini and Thompson each owned 38.125 percent of petitioner's stock. Their combined

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

stock ownership in petitioner was 76.25 percent. Nomellini and Thompson were president and secretary-treasurer, respectively, of petitioner and were members of the board of directors. Thompson was responsible for the administration of Collins; Nomellini oversaw its labor. A major part of the real estate used by Collins was owned, directly or indirectly, in equal shares by Nomellini and Thompson.

Del Monte Electric Co. (hereinafter Del Monte) was incorporated in 1956 under the laws of California for the purpose of operating a general electrical contracting business and had, at all times material herein, its principal place of business in Hayward, Calif. During the years in issue, Nomellini and Thompson each owned 39.02 percent of Del Monte's stock. Their combined stock ownership in Del Monte was 78.04 percent. The remaining 21.96 percent of the stock was owned by Foster E. Daoust (Daoust). Nomellini and Thompson were president and secretary-treasurer, respectively, of Del Monte and were on the board of directors. Daoust was operations manager of Del Monte. Mrs. Sanguinetti, Nomellini, and Thompson owned, in equal shares, the real estate used by Del Monte.

In addition to their equal stock ownership in Collins and Del Monte, Nomellini and Thompson also had, during 1971 and 1972, equal equity interests in, and were officers of, five other companies: Modern Electric Co., Inc., of Fresno was incorporated under the laws of California in 1957 for the purpose of operating a general electrical contracting business (39.666-percent stock ownership each); Collins Electric Co. of San Francisco was incorporated in 1965 under the laws of California for the purpose of operating a general electrical contracting business (25-percent stock ownership each); Home Wiring Co. was incorporated under the laws of California in 1967 for the purpose of operating a general electrical contracting business (19.666- and 20-percent stock ownership, respectively); Acme Collins Co., Inc., was incorporated in 1954 under the laws of Nevada for the purpose of operating a general electrical contracting business (35-percent stock ownership each); and Delta Switchboard Co. was incorporated in 1953 under the laws of California for the purpose of manufacturing switchboards (33.333-percent stock ownership each).

Each of the seven companies in which Nomellini and Thompson had equal stock ownership maintained separate books and records, operated independently, and individually filed and reported its Federal income tax based on the completed contract method. However, except for Acme Collins Co., Inc., all such books and records were kept at petitioner's place of business.

One Schuman, an employee of Collins, had the primary responsibility of overseeing the books and records of all the above-mentioned companies. One Bacigalupe, also an employee of Collins, had the primary responsibility of office management. Both of these individuals had the delegated authority to transfer funds temporarily from one of these seven companies to another one if such latter company's bank balance was low. However, Nomellini and Thompson reviewed the larger advances.

Throughout each of petitioner's fiscal years here in issue, petitioner advanced large sums of money, interest free, to Del Monte to be used in Bay Area Rapid Transit (BART) jobs for which Del Monte had contracts. Collins had no interest in these contracts. At the end of each of these fiscal years, Del Monte would pay the balance owing to Collins. For this purpose Del Monte would borrow funds from various banks, and then, at the beginning of petitioner's next fiscal year, Del Monte would borrow money back from petitioner and pay off the bank loans.

During the years in issue, petitioner made no interest-free loans or advances to any parties other than Del Monte, Modern Electric Co., Inc. of Fresno, Collins Electric Co. of San Francisco, Home Wiring Co., Acme Collins Co., Inc., or Delta Switchboard Co., all companies in which Nomellini and Thompson had equal stock ownership, or to Nomellini and Thompson themselves.

Nomellini and Thompson saw each other every day during 1971 and 1972 and, together, they reviewed Del Monte's financial statements each month. They regularly met with Daoust, Del Monte's operations manager, at the close of each of petitioner's fiscal years and, if any problems arose with respect to Del Monte's day-to-day operations, Daoust consulted them.

When the large sums were advanced to Del Monte during petitioner's fiscal years 1971 and 1972, Nomellini and Thompson reviewed these advances to see how the money was to be used by Del Monte and discussed the necessity of making such advances. They determined that the money was needed to pay Del Monte's material and labor costs incurred in the performance of BART construction contracts for which Del Monte was not currently being paid. They concluded that the money would be paid to Del Monte for the contracts and that it was just a matter of time in collecting it. On this basis, they approved the advances to Del Monte. In lieu of the advances made by petitioner to Del Monte, Nomellini and Thompson could have had Del Monte's suppliers bill Collins and then have Collins rebill Del Monte on their accounts receivable.

Petitioner filed its Federal corporate income tax returns for its fiscal years ended September 30, 1971, and September 30, 1972, and reported the following:

|  | Sept. 30, 1971 | Sept. 30, 1972 |
|---|---|---|
| Gross sales | $9,923,981.81 | $11,894,241.79 |
| Taxable income | 706,304.52 | 661,997.15 |
| Total tax | 332,480.53 | 307,520.91 |

Del Monte filed its Federal corporate income tax returns for its fiscal years ended May 31, 1971, May 31, 1972, and May 31, 1973, and reported the following:

|  | May 31, 1971 | May 31, 1972 | May 31, 1973 |
|---|---|---|---|
| Gross sales | $5,083,496.60 | $2,231,607.48 | $1,691,294.02 |
| Taxable income | 18,139.53 | 23,955.97 | 4,080.79 |
| Total tax | 4,007.10 | 4,841.34 | 472.37 |

During the period September 30, 1970, through September 30, 1972, an interest rate of 5 percent for loans or advances was an arm's-length rate. Interest at the rate of 5 percent per year computed daily on the outstanding balances for the periods Del Monte owed money to petitioner during petitioner's taxable year ended September 30, 1971, totaled $42,383.91; for petitioner's taxable year ended September 30, 1972, the interest so computed totaled $25,822.77.

In his notice of deficiency sent to petitioner on July 10, 1974, the Commissioner determined, under section 482, that interest income in the above amounts should be allocated to

petitioner in respect of the moneys advanced to Del Monte during petitioner's fiscal years 1971 and 1972. On the same date, both petitioner and Del Monte were notified by letter of the section 482 adjustments and that claims for Federal income tax refunds for Del Monte's fiscal years ended May 31, 1971, May 31, 1972, and May 31, 1973, should be filed. The communication was sent to petitioner's attorney, and a copy was sent to Del Monte. The letter stated in pertinent part as follows:

If the government's position is sustained by the Tax Court, then correlative adjustments to the income of Del Monte Electric Co., Inc. should be made. Those adjustments will be as follows:

|  | FYE 5/31/71 | FYE 5/31/72 | FYE 5/31/73 |
|---|---|---|---|
| Increase in interest expense (decrease to taxable income) | $26,347.79 | $36,395.57 | $5,462.31 |

Since the statute of limitation will expire prior to Tax Court consideration, it is suggested that you file a protective claim for refund for each of the taxable years. Explain in your claim the reason for the additional interest expense deduction, i.e. section 482 adjustment, and that the issue is pending before the Tax Court.

Del Monte filed its claims for refund on October 16, 1974, with the Fresno Internal Revenue Service Center.

OPINION

Section 482 confers broad power upon the Commissioner of Internal Revenue to allocate the gross income of commonly controlled organizations as follows:

In any case of two or more organizations, trades, or businesses * * * owned or controlled directly or indirectly by the same interests, the * * * [Commissioner] may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, * * * if he determines that such * * * allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The Commissioner's authority under section 482 was described by this Court in *Pauline W. Ach*, 42 T.C. 114, 125–126 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966), as follows:

The Commissioner has considerable discretion in applying this section and his determinations must be sustained unless he has abused his discretion. We may reverse his determinations only where the taxpayer proves them to be unreasonable, arbitrary, or capricious. * * *

See also *Ballentine Motor Co. v. Commissioner*, 321 F.2d 796, 800 (4th Cir. 1963), affg. 39 T.C. 348 (1962); *Commissioner v. Chelsea Products*, 197 F.2d 620 (3d Cir. 1952), affg. 16 T.C. 840 (1951).

The standard to be applied by the Commissioner in making allocations of income, deductions, credits, or allowances between commonly controlled organizations under section 482 is set forth in section 1.482–1(b)(1), Income Tax Regs., in pertinent part as follows:

The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. * * * The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

Thus, by using the standard of uncontrolled taxpayers dealing at arm's length to determine the controlled taxpayer's "true taxable income," section 482 equalizes the treatment of controlled and uncontrolled taxpayers and prevents the artificial shifting of income. *Robert M. Brittingham*, 66 T.C. 373, 396 (1976), on appeal (5th Cir., Dec. 27, 1976); *Huber Homes, Inc.*, 55 T.C. 598, 605 (1971).

Collins and Del Monte, both electrical contractors, operated independently of each other in different geographical locations. Had they been located in the same area, they might have been competitors. Yet, during the years at issue, Collins, which had substantial taxable income, made large sums of money available to Del Monte, interest free, to be used in carrying out its BART construction contracts in which Collins had no stake. Del Monte repaid the advances shortly before each year's end by borrowing the outstanding balance from various banking institutions. Then, after the close of the year, Collins again advanced Del Monte, interest free, the sums needed to repay the bank loans.

From these facts it is apparent that these parties were not dealing at arm's length. Had petitioner and Del Monte dealt at arm's length, as contemplated by the standard enunciated

in the above regulation, Collins would have been compensated for the use of such funds. Del Monte's failure to compensate Collins for such use distorted the tax results of both corporations. Section 1.482–2(a)(1),[2] Income Tax Regs., in general terms, provides that when one member of a controlled group makes a loan or advance to another member without interest, an appropriate allocation to reflect an arm's-length interest rate may be made. Thus, the instant case presents precisely the type of income distortion which section 482 was designed to prevent, and respondent has followed the applicable regulation in making the allocation.[3]

Petitioner argues, however, that Collins and Del Monte were not "owned or controlled directly or indirectly by the same interests" as required by section 482. We do not agree.

The language of section 482 is broad and sweeping, and its application depends on a finding of either ownership or control. The type of control contemplated by the statute is reflected in section 1.482–1(a)(3), Income Tax Regs., which deals with the concept in all-embracing terms as follows:

The term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the

---

[2] Sec. 1.482–2(a)(1) and (2), Income Tax Regs., is, in part, as follows:

Sec. 1.482–2 Determination of taxable income in specific situations.

(a) *Loans or advances*—(1) *In general.* Where one member of a group of controlled entities makes a loan or advance directly or indirectly to, or otherwise becomes a creditor of, another member of such group, and charges no interest, or charges interest at a rate which is not equal to an arm's length rate as defined in subparagraph (2) of this paragraph, the district director may make appropriate allocations to reflect an arm's length interest rate for the use of such loan or advance.

(2) *Arm's length interest rate*—(i) *In general.* For the purposes of this paragraph, the arm's length interest rate shall be the rate of interest which was charged, or would have been charged at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances. All relevant factors will be considered, including the amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans.

[3] Petitioner's argument that there was no intent on its part to evade or avoid taxes was answered in *Fitzgerald Motor Co. v. Commissioner,* 508 F.2d 1096, 1102 (5th Cir. 1975), affg. 60 T.C. 957 (1973), as follows:

"Actual intent to evade taxes is not a prerequisite to the Commissioner's invocation of section 482. The authority to determine true taxable income extends to any case in which the taxable income of a controlled taxpayer is other than it would have been had the taxpayer been dealing at arm's length with an uncontrolled taxpayer. Treas. Reg. sec. 1.482–1(c)."

reality of the control which is decisive, not its form or the mode of its exercise. * * *

Thus "actual control," not record ownership, is determinative as to whether the requisite control exists for application of the statute. *Robert M. Brittingham*, 66 T.C. 373, 396 (1976), on appeal (5th Cir., Dec. 27, 1976); *Pauline W. Ach*, 42 T.C. 114, 125 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966); *Grenada Industries, Inc.*, 17 T.C. 231, 254 (1951), affd. 202 F.2d 873 (5th Cir. 1953), cert. denied 346 U.S. 819 (1953).

The record in this case demonstrates that Collins and Del Monte were both owned and controlled, within the meaning of section 482, by the same two individuals. Nomellini and Thompson together had record ownership of approximately 76 percent of petitioner's stock and 78 percent of Del Monte's stock, and their ownership in each corporation was divided equally between them (38.125 shares each in Collins and 39.02 shares each in Del Monte). They owned equal interests in most of the real estate used by each of those corporations. Nomellini and Thompson were president and secretary-treasurer, respectively, and members of the board of directors of both corporations.

Thompson, who headed the administration of Collins, and Nomellini, who commanded its labor, were in daily contact with each other. Del Monte's books and records were kept at Collins' place of business, and Nomellini and Thompson together reviewed the financial statements of Del Monte each month. They were in close communication with Daoust, Del Monte's operations manager, concerning the overall policy of Del Monte, as well as the day-to-day problems which arose.

The decisions concerning the transfers of substantial funds, interest free, to Del Monte, although delegated to certain employees of Collins (Bacigalupe and Schuman), were carefully reviewed, strictly scrutinized, and finally approved by Nomellini and Thompson. Nothing in the evidence before us indicates that Daoust played an independent role in the tentative decision by Bacigalupe and Schuman to make such advances or the later ratification by Nomellini and Thompson. Whatever Daoust did was done as a minority shareholder or an employee subject to the direction of Nomellini and Thompson. Indeed, we think that Thompson's testimony

clearly demonstrates the complete control that he and Nomellini had over petitioner and Del Monte. He testified that, as the person in charge of the administration and money of Collins, if he had thought interest would be imputed as a result of the transfer of these funds, "the money that we had in Del Monte's bank account would have been taken back to Collins immediately."

Petitioner also attacks respondent's computation of interest applied on a day-to-day basis to the outstanding balances owed by Del Monte to petitioner. Petitioner argues that the computation of interest should be based upon the average end-of-the-month balance. However, the parties stipulated as to the accuracy of respondent's computation of interest at the rate of 5 percent per year computed daily and, at trial, petitioner made no objections to such stipulation. Furthermore, petitioner has presented no evidence and cited no legal authority to support its theory. Thus we find that petitioner has not offered this Court facts to show any error in the computation of the allocated interest.

Petitioner further argues that interest imputed to it should be computed only on advances outstanding for more than 6 months. Petitioner cites section 1.482–2(a)(3), Income Tax Regs., for the proposition that interest commences at a date 6 months after the date the indebtedness arises. That regulation is, in pertinent part, as follows:

The interest period shall commence at the date the indebtedness arises, except that with respect to indebtedness described in subdivision (ii) of this subparagraph that is not evidenced by a written instrument requiring payment of interest, the interest period shall not commence until a date 6 months after the date the indebtedness arises, or until a later date if the taxpayer is able to demonstrate that either it or others in its industry, as a regular trade practice, permit comparable balances in the case of similar transactions with unrelated parties to remain outstanding for a longer period without charging interest. * * *

The "indebtedness described in subdivision (ii)" of that regulation is as follows:

Indebtedness arising in the ordinary course of business out of sales, leases, or the rendition of services by or between members of the group, or any other similar extension of credit.

As above noted, Collins and Del Monte were in the same business and operated independently in different geographical

locations. There is no proof in the record, except for the interest-free loans, that they had any business dealings with each other. Thus, simply put, the indebtedness did not arise "in the ordinary course of business out of sales, leases, or the rendition of services by or between members of the group." Therefore, interest should be imputed, as respondent contends, "after the date the indebtedness" arises.

Petitioner next argues that, if interest income is imputed to it for moneys loaned, interest free, to Del Monte, it is entitled to a credit in the amount of interest computed on the sum of money advanced to Del Monte but which was not "used" by Del Monte. That is, petitioner contends that a certain portion of the advanced money merely sat in the bank and was not used to generate any income. Since the money produced no income in Del Monte's hands, petitioner argues, there was no income which could be allocated to Collins.

The Court of Appeals for the Ninth Circuit (to which an appeal would be taken in this case) answered that argument in *Kerry Investment Co. v. Commissioner*, 500 F.2d 108, 110 (9th Cir. 1974), revg. in part 58 T.C. 479 (1972), by quoting as follows from *Kahler Corp. v. Commissioner*, 486 F.2d 1, 5 (8th Cir. 1973), revg. 58 T.C. 496 (1972):

> The proper standard to be applied in cases such as this is whether or not the loans from the taxpayer to other members of a controlled group would have been made on an interest free basis in arm's length dealings between uncontrolled taxpayers. Whether the Commissioner shows that the borrowed funds actually produced income for the borrowing corporation is of no importance. Money, and the use of money, is an essential element in the profit making activities of most corporations, just as raw material is a necessary component in the manufacture of salable goods. [Fn. ref. omitted.]

The court specifically rejected the proposition that transfers of funds between controlled corporations must be traced to the production of gross income. Under the principle of our decision in *Jack E. Golsen*, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we shall follow the *Kerry Investment Co.* opinion of the Court of Appeals for the Ninth Circuit and reject petitioner's argument that interest income may not be allocated to it in respect of the moneys received by Del Monte which merely remained in the bank.[4]

---

[4] This issue has been before the appellate courts also in *B. Forman Co. v. Commissioner*, 453 F.2d 1144 (2d Cir. 1972), revg. in part 54 T.C. 912 (1970), cert.

Finally, petitioner argues that, when Del Monte filed its protective claims for refund for its fiscal years ended May 31, 1971, May 31, 1972, and May 31, 1973, on October 16, 1974, the statute of limitation for filing a claim with respect to Del Monte's fiscal year ended May 31, 1971, had already expired on August 15, 1974. Thus petitioner contends that a primary adjustment cannot be asserted against it for its fiscal year ended September 30, 1971, since the correlative adjustment for Del Monte with respect to its fiscal year ended May 31, 1971, is barred by the statute of limitation.

However, Del Monte is not a party to this action, and its tax liability is not before this Court. The Commissioner has asserted a primary adjustment against petitioner, and our jurisdiction extends only to that adjustment. Whether Del Monte will ultimately receive a refund for its 1971 fiscal year dispite its failure to file a claim within the period specified by section 6511(a), we need not decide.

We do not intend our holding on this issue to be read to sanction a double tax on the same income—a tax as a result of the primary adjustment without an accompanying correlative adjustment. Section 482 indeed contemplates that when the Commissioner allocates income to one commonly controlled organization he will make a correlative adjustment in the income of the other.[5] See, e.g., R. T. French Co., 60 T.C. 836,

---

denied 407 F.2d 934 (1972), and *Fitzgerald Motor Co. v. Commissioner,* 508 F.2d 1096 (5th Cir. 1975), affg. 60 T.C. 957 (1973), and those courts also adopted a position inconsistent with the views elaborated in our Court-reviewed opinions in *Kerry Investment Co.,* 58 T.C. 479 (1972), revd. in part 500 F.2d 108, 110 (9th Cir. 1974), and *Kahler Corp.,* 58 T.C. 496 (1972), revd. 486 F.2d 1, 5 (8th Cir. 1973). We have decided in the instant case to postpone an in-depth reexamination of our views on the "creation" of income issue because the parties appear, at least implicitly, to assume that we will follow the views of the Court of Appeals for the Ninth Circuit and, consequently, have not briefed the issue extensively.

[5] Sec. 1.482–1(d)(2), Income Tax Regs., is, in part, as follows:

(2) Whenever the district director makes adjustments to the income of one member of a group of controlled taxpayers (such adjustments being referred to in this paragraph as "primary" adjustments) he shall also make appropriate correlative adjustments to the income of any other member of the group involved in the allocation. The correlative adjustment shall actually be made if the U.S. income tax liability of the other member would be affected for any pending taxable year. Thus, if the district director makes an allocation of income, he shall not only increase the income of one member of the group, but shall decrease the income of the other member if such adjustment would have an effect on the U.S. income tax liability of the other member for any pending taxable year. For the purposes of this subparagraph, a "pending taxable year" is any taxable year with respect to which the U.S. income tax return of the other member has been filed by the time the allocation is made, and with respect to which a credit or refund is not barred by the operation of

849 (1973); *Smith-Bridgman & Co.*, 16 T.C. 287, 294 (1951); *Hearst Corp.*, 14 T.C. 575, 577 (1950). In many cases, as in the instant one, the correlative adjustment will result in an overpayment by the related taxpayer. In a non-section 482 situation, an overpayment of taxes ordinarily will be refunded only if a timely claim therefor has been filed. Sec. 6511(a). Yet a primary adjustment under section 482 is not considered to have been made (and therefore a correlative adjustment is not required to be made) until the correctness of the adjustment has been settled by agreement, by payment of the deficiency, or by some other form of final determination. Sec. 1.482–1(d)(2), Income Tax Regs.; *Fitzgerald Motor Co. v. Commissioner*, 508 F.2d 1096, 1102 (5th Cir. 1975), affg. 60 T.C. 957 (1973). The occurrence of any one of such events usually takes place long after the normal limitation period for refund claims has expired.

Adoption of petitioner's position that a primary adjustment cannot be made where the statute of limitation bars the correlative adjustment, therefore, would open the door for a related taxpayer to block a primary adjustment under section 482 by simply failing or refusing to file a claim for the refund of the overpayment resulting from the correlative adjustment. On the other hand, if the related taxpayer is required to file a timely claim under section 6511(a) for the refund of such overpayment, the Commissioner could effectively tax the

---

any law or rule of law. If a correlative adjustment is not actually made because it would have no effect on the U.S. income tax liability of the other member involved in the allocation for any pending taxable year, such adjustment shall nevertheless be deemed to have been made for the purpose of determining the U.S. income tax liability of such member for a later taxable year, or for the purposes of determining the U.S. income tax liability of any person for any taxable year. The district director shall furnish to the taxpayer with respect to which the primary adjustment is made a written statement of the amount and nature of the correlative adjustment which is deemed to have been made. For purposes of this subparagraph, a primary adjustment shall not be considered to have been made (and therefore a correlative adjustment is not required to be made) until the first occurring of the following events with respect to the primary adjustment:

(i) The date of assessment of the tax following execution by the taxpayer of a Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) with respect to such adjustment,

(ii) Acceptance of a Form 870–AD (Offer of Waiver of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment),

(iii) Payment of the deficiency,

(iv) Stipulation in the Tax Court of the United States, or

(v) Final determination of tax liability by offer-in-compromise, closing agreement, or court action.

same income to both taxpayers through careful timing of the notice of deficiency concerning the primary adjustment. Neither of these results was intended by section 482.

Section 482 may contemplate a suspension of the running of the statute of limitation on claims for refund of the overpayment attributable to the correlative adjustment or, as the first sentence of section 1.482–1(d)(2), Income Tax Regs., quoted in footnote 5, *supra,* seems to suggest, may impose a positive duty on the Commissioner, without regard to the statute of limitation on refund claims, to refund such overpayment. In any event, as above noted, Del Monte's claim is not before us, and we need not attempt to define Del Monte's rights. We hold only that the allocation of interest income to Collins for the taxable year ended September 30, 1971, is not barred by any act or omission of Del Monte in respect of a claim for the refund of the overpayment attributable to the correlative adjustment for that year.[6]

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[6] The Commissioner's letter of July 10, 1974, suggesting that Del Monte file protective claims for refund, shows that the Internal Revenue Service did not attempt to take an unfair advantage by making a primary adjustment without a correlative one. However, we think the right to a correlative adjustment cannot depend on which side is to blame for procedural errors.