Thomas B. Fegan, Petitioner v. Commissioner of Internal Revenue, Respondent

Docket No. 5253–77.    Filed February 14, 1979.

*Murray F. Hardesty*, for the petitioner.
*John Wendell Paul*, for the respondent.

Scott, *Judge:* Respondent determined deficiencies in petitioner's income tax for the taxable years 1970, 1971, 1972, and 1973 in the amounts of $4,643, $29,247, $32,852, and $4,284, respectively.

The issues for decision are:

(1) Whether under section 482, I.R.C. 1954,[1] respondent properly allocated to petitioner for each of the years 1971, 1972, and 1973 additional rental income from a motel facility owned by petitioner and rented by him to a corporation the stock of which was owned 76 percent by him and 24 percent by his two sons.

(2) Whether respondent properly disallowed investment credits claimed by petitioner for each of the years 1971, 1972, and 1973 with respect to certain personal property included in the

___

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here involved, unless otherwise indicated.

furnishings and fixtures of the motel facility rented by petitioner to the corporation during the years 1971, 1972, and 1973.

The year 1970 is involved in this case only because of the elimination of a tentative allowance of a loss carryback from the year 1973 and an investment credit carryback from 1973. The correctness of these adjustments is dependent upon the determination of the other issues presented in this case.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner, an individual who resided in Junction City, Kans., at the time of the filing of the petition in this case, filed a joint Federal income tax return for each of the years 1970 and 1971 with his wife, Patricia Fegan, who died January 10, 1971. For the calendar years 1972 and 1973, petitioner filed an individual Federal income tax return as a single taxpayer. Petitioner's returns for each of these years was filed with the Internal Revenue Service Center at Austin, Tex. These returns were prepared on the cash receipts and disbursements method of accounting.

Fegan Enterprises, Inc. (Enterprises), is a Kansas corporation which was incorporated on January 2, 1970. Approximately 76 percent of Enterprises' stock was owned during the years here in issue by petitioner and the balance of the stock was owned equally by petitioner's two sons, T. Michael Fegan (Michael) and Robert R. Fegan (Robert). During the years here in issue, petitioner was the president of Enterprises. He received no compensation for his services as president during any of the years here in issue. During these years petitioner was also vice president of the Junction City Telephone Co. and was compensated for his services in this capacity. Petitioner's son Michael was vice president of Enterprises and his son Robert was secretary. Both Michael and Robert received compensation for their services to Enterprises during the years here in issue— Michael receiving $4,500, $3,600, and $4,800 for the fiscal years of Enterprises ending November 30 of 1971, 1972, and 1973, respectively, and Robert receiving $2,400, $3,600, and $400 for these respective fiscal years of Enterprises.

At the time Enterprises was incorporated, petitioner trans-

ferred to the corporation between 18 and 20 properties previous-
ly owned by him individually which at the time of transfer had a
total value of approximately $350,000. During the years 1970
through 1973, petitioner made interest-free loans to Enterprises
without security or formal evidence of the indebtedness. As of
November 30, 1971, 1972, and 1973, the balance of the
outstanding loans from petitioner to Enterprises amounted to
$93,064.66, $80,621.01, and $83,774.38, respectively.

In 1961, petitioner and several other persons formed a
corporation which built a motel in Junction City. The motel,
known as the Continental Host, was owned and operated by the
corporation. Sometime after its formation, the corporation
became a subchapter S corporation. Petitioner became interest-
ed in the actual operation of the Continental Host Motel
sometime after the commencement of its operation and for the
period from late 1968 until sometime in 1969 took an active
interest in the operation of the motel.

The motel business was sold by the subchapter S corporation
in 1969.

Petitioner had for a number of years prior to the years here in
issue owned various types of interests in real estate. During his
active business career he had acquired around 50 properties,
some of which he had sold after their acquisition. In 1966,
petitioner commenced operation of a cocktail lounge through a
corporation—the Lantern Club, d.b.a. the Torchlight Lounge.
Initially this cocktail lounge was operated in the Continental
Host Motel.

In 1969, petitioner became interested in the possibility of
construction of a motel in Junction City, Kans., with the idea of
obtaining a national franchise under which the motel would be
operated. In furtherance of his plan, petitioner engaged a firm
of certified public accountants to make a study on market
demands and economic feasibility for a proposed motor inn in
Junction City, Kans. This firm furnished petitioner with a report
dated September 1969 which stated that after considering the
economic conditions existing in Junction City, it was concluded
that the area could support a 100-room motor inn facility to be
located in the place petitioner was considering building a motel
if the motel was operated with a national affiliation and referral
service. This report pointed out the dependence of Junction City
on activities at the nearby army post, Fort Riley, and on tourist

business available from tourists visiting the historic attractions at Fort Riley and the Eisenhower Center at nearby Abilene, Kans. The report also pointed out that at times motel rooms were in demand by persons attending athletic events at Kansas State University, Manhattan, Kans., approximately 19 miles from Junction City.

The report analyzed the rooms presently available in Junction City and the surrounding area, as well as the restaurant facilities available in Junction City. With respect to the analysis of operation of restaurant facilities, the report stated the opinion that: "a first-class distinctive atmosphere restaurant offering quality food, excellent service, and moderate prices would receive strong support from both local residents and transient guests."

With respect to room occupancy, the report estimated the share of the market that could realistically be obtained by a 100-room facility, located where petitioner proposed to locate the motel, to be between 23,000 and 26,000 room nights annually or an occupancy level between 65 percent and 70 percent. The report stated that this occupancy would be between 42 and 47 percent of the total room demand in Junction City and surrounding areas, but in the opinion of the writer the favorable location of the motel, coupled with a national affiliation and referral service, would enable the motel to capture an above average share of the market.

The report recommended a rate structure of $10 to $12 for single rooms and $13 to $15 for double rooms, scaled to attain an average rate of between $10.50 and $11.50 per day per room. The report pointed out that it was customary in the area to allow a discount of $1 to certain commercial customers and to charge $1 per room more during the summer months when the tourist trade was more available than in the winter months. The report recommended building the motel in such a manner that 30 of the 100 rooms could be closed off during the winter months when demand for rooms was low, thereby saving utility and related costs with respect to vacant rooms.

Attached to the report was a statement of estimated income and expenses for a proposed 100-room motor inn with 36,500 rooms available annually. This report showed the income expectations on the basis of various percentages of occupancy. (See table on p. 795.)

| Total sales and income | 65% Occupancy 23,725 rooms occupied average rate $10.50 | | 70% Occupancy 25,550 rooms occupied average rate $11.00 | | 75% Occupancy 27,357 rooms occupied average rate $11.50 | |
|---|---|---|---|---|---|---|
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| Rooms .............. | $249,000 | 49.4% | $281,000 | 51.3% | $315,000 | 53.0% |
| Food (including sundry income) ....... | 240,000 | 47.6% | 250,000 | 45.6% | 260,000 | 43.7% |
| Telephone ......... | 13,000 | 2.6% | 15,000 | 2.7% | 17,000 | 2.9% |
| Other income ...... | 2,000 | .4% | 2,000 | .4% | 2,000 | .4% |
| Total ......... | 504,000 | 100.0% | 548,000 | 100.0% | 594,000 | 100.0% |

The report concluded that a profit before depreciation, rent, interest, amortization, and income taxes, but including $35,000 profits from lease of stores including a private club cocktail lounge, of $115,000, $139,000, and $166,000, could be anticipated based on 65-percent occupancy, 70-percent occupancy, and 75-percent occupancy, respectively.

After receiving this report, petitioner proceeded with the construction of the motel facility. One reason petitioner had the study made was that he was attempting to obtain a franchise from the Downtowner Corp. to operate the motel as a Downtowner Motor Inn. In late 1969 or early 1970, prior to the completion of construction of the motel, petitioner did receive this franchise in his personal name.

When petitioner commenced construction of the motel he planned to operate it through Enterprises. However, after the death of his wife in early January 1971, petitioner began investigating the possibility of leasing the motel properties to an unrelated motel operation with a national affiliation. He discussed the proposition with the representatives of several national chains, but the only offer he actually received was from Royal Inns. The offer from Royal Inns was for rental only of the rooms and lobby area, excluding the dining room and kitchen facilities, since Royal Inns was not interested in operating the dining facilities. The offer of Royal Inns was to pay a rental of 27 percent of gross room receipts to petitioner. Petitioner concluded that the Royal Inns did not have the financial stability which he wanted in a lessee.

Petitioner obtained a loan in the amount of $350,000 from Capital Federal Savings & Loan, Topeka, Kans., to partially finance the construction of the motel facility. In late 1970, petitioner had obtained a commitment for a loan up to $450,000, but did not draw any amount on the commitment until about July of 1971 and did not draw the final portion of the $350,000 until August or early September of 1971. He drew in total only $350,000 of the committed amount. Petitioner and Enterprises had agreed to the terms of a lease agreement for the motel properties prior to the time petitioner drew the final amount of the $350,000 loan. The loan agreement with Capital Federal Savings & Loan provided for monthly payments of principal and interest in the total amount of $3,800 to be paid over the 14-year

life of the financing agreement. Petitioner made the first $3,800 payment on October 1, 1971.

On June 25, 1971, prior to the opening of the motel in early August 1971, petitioner leased a "clubroom" in the motel approximately 27 feet by 54 feet to his cocktail lounge, the Lantern Club, d.b.a. the Torchlight Lounge, in order to move the operation from the Continental Host over to the new motel. The rental provided for in the lease agreement was $400 monthly. On June 15, 1971, petitioner leased the north one-half of the annex building of the motel property to his son, Michael, for $125 monthly, the premises to be used for operating a retail liquor store. In this lease, petitioner agreed to pay all utilities, except telephone, with respect to the premises.

During 1971, petitioner leased a portion of the motel facilities to Enterprises for use as a motel and restaurant for a term of 10 years. Operation of the motel began in early August 1971 and the ceremonies of the opening of the motel were held on September 16, 1971. From the time of commencement of operation of the motel in August 1971, the operation was carried on by Enterprises.

Petitioner and Enterprises had agreed to terms for the leasing by Enterprises of the motel properties owned by petitioner, and petitioner's attorney had prepared for petitioner a document entitled "Lease and Operation Agreement" providing for the leasing by Enterprises of the motel properties in accordance with the agreement between petitioner and Enterprises several months prior to December 1, 1971. The terms of the document incorporated petitioner's understanding of the agreement between himself and Enterprises, and the document as initially drafted by the attorney was subsequently executed by petitioner personally and petitioner as president of Enterprises, except that the space left blank for the date the lease was entered into was filled in with handwriting in ink. The first paragraph of the executed lease states that the agreement is "made and entered into" by the parties "this *1st* day of *Dec. 1971.*" The handwritten notation "1st" and "Dec. 1971" were inserted by petitioner in the typewritten agreement previously prepared for him by his lawyer. The lease and operation agreement provided for lease of the premises and use by Enterprises of the franchise which petitioner held in his own name from the Downtowner Motor

Inn. The agreement, which contained 21 pages of detailed provisions, insofar as here pertinent, stated:

## LEASE AND OPERATION AGREEMENT

\*       \*       \*       \*       \*       \*       \*

That Lessor, \* \* \* does \* \* \* lease \* \* \* unto Lessee the land and premises being a Downtowner Motor Inn located in Geary County, Junction City, Kansas, and described as:

\*       \*       \*       \*       \*       \*       \*

said premises being leased, with certain exceptions set forth in the leases attached as Exhibit "I" and Exhibit "II" which are made a part hereof, together with all rights, privileges, easements and appurtenances thereunto belonging, including fixtures, equipment and furniture located on said premises, \* \* \*

TO HAVE AND TO HOLD the leased premises as a Downtowner Motor Inn for a term beginning on _____ and ending _____ upon and subject to the terms, conditions, provisions and restrictions which the parties hereto mutually agree to observe, keep and perform, as follows, to-wit:

### ARTICLE I

That Lessor, further grants to Lessee the exclusive right to operate, manage and administer the subject matter of this agreement only as a Downtowner Motor Inn. It is agreed that this grant is a part of this agreement and is subject to the terms, conditions, provisions and restrictions as herein set forth.

### ARTICLE II

As rent for the leased premises, Lessor reserves and Lessee covenants and agrees to pay to Lessor, at the office of Lessor in Junction City, Kansas, or at such other place as Lessor may designate in writing from time to time, rent for and during the full term hereof, without notice or demand, as set forth on Exhibit "III".

\*       \*       \*       \*       \*       \*       \*

### ARTICLE VII

Lessor shall keep and maintain the roof, exterior walls, foundations, gutters and downspouts of the building containing the leased premises in good condition and repair and shall make all repairs to said building required because of structural defects.

Subject to the duties and obligations of Lessor stated in the preceding paragraph of this article and elsewhere in this lease, Lessee shall keep and maintain the interior of the leased premises and the windows thereto in good condition and repair, damage by fire or other casualty and normal wear and tear and obsolescence excepted.

\*     \*     \*     \*     \*     \*     \*

## ARTICLE X

Lessee shall pay for the light, heat, power, water and all other utilities and utility services used on or about the leased premises and shall contract for the same in Lessee's own name.

\*     \*     \*     \*     \*     \*     \*

## ARTICLE XIII

Lessee covenants and agrees to maintain at all times during the life of this lease public liability insurance under which Lessor shall be named as an insured, properly protecting and indemnifying Lessor, \* \* \*

\*     \*     \*     \*     \*     \*     \*

## ARTICLE XIV

Lessee covenants and agrees to pay, before the same become delinquent and before interest begins to accrue thereon, all taxes and assessments, general and special, which have heretofore been or are during the life of this lease levied and assessed against the leased premises and the building containing same or appurtenances thereof, and parking and other areas serving same; \* \* \*

Lessee further covenants and agrees to keep and maintain at all times during the life of this lease, fire and extended coverage insurance on the building containing (exclusive of foundations) the leased premises in an amount not less than ninety percent (90%) of their full insurable value. \* \* \*

\*     \*     \*     \*     \*     \*     \*

## ARTICLE XXIV

Lessor hereby grants unto Lessee the sole, exclusive and continuing right and option, exercisable as herein provided, to extend the term of this lease for a period of ten (10) years from the end of the primary term and from the end of any two (2) successive ten (10) year extensions thereof, upon the same terms and conditions specified herein as to rent and otherwise.

Although in the formally signed lease agreement the term of the lease was left blank, in fact, the term was 10 years.

The exceptions to the leased premises attached as Exhibits I and II were the leases to Michael and to the Lantern Club. The third attachment to the lease with respect to rental provided for a minimum rental in the sum of $45,600 per year payable in advance in equal monthly installments of $3,800 due the first day of the month. In addition, there was a provision for percentage rental of a further sum. This provision stated:

(b) Percentage rent: The further sum each rent period of the lease term

equal *to twenty-five percent (25%) of Gross Room Rental above Two Hundred Fifty Thousand Dollars,* ($250,000)* hereby designated as "percentage rent", payable for and with respect to each rent year during the term hereof within *sixty (60) days after billing,* to the extent that the rental so computed shall be greater than the minimum rental for the lease year with respect to which the percentage rental is computed.

---

*and eight percent (8%) of Gross Cafe Sales above One Hundred Seventy-five Thousand Dollars ($175,000)

In 1973, Travelodge opened a new 208-room motel in Junction City. Enterprises operated the motel facility leased to it by petitioner as a Downtowner Motor Inn throughout the years here in issue. Enterprises continued in later years to operate the motel facility but beginning in 1974 operated it as a Hilton.

On its returns for its fiscal years ending November 30, 1971, 1972, and 1973, Enterprises deducted on its motel operation taxes (other than payroll taxes) and insurance in the amounts indicated:

|  | *Fiscal year* | | |
|---|---|---|---|
|  | *1971* | *1972* | *1973* |
| Taxes .......... | 0 | $9,078.68 | $17,019.83 |
| Insurance ..... | [1]$540 | [2]3,420.24 | [3]3,539.03 |

[1]$230 of this amount relates to the restaurant.
[2]$647.05 of this amount relates to the restaurant operation.
[3]$708.11 of this amount is in respect to the restaurant operation.

Petitioner's cost bases in the facilities leased to Enterprises were as follows:

| | |
|---|---|
| Equipment ................................. | $223,425.46 |
| Building ..................................... | 781,771.32 |
| Land ......................................... | 40,832.10 |
| Total...................................... | 1,046,028.88 |

Depreciation on the equipment and building were computed by petitioner on a straight-line basis commencing with August 1, 1971.

Petitioner received from Enterprises payment of $3,800 a month beginning February 17, 1972, for the use of the facility. Rental payments for November and December of 1971 and January of 1972 were paid on February 14, 1973.

At approximately the time of the opening of the motel operation by Enterprises, petitioner became a member of the

American Hotel and Motel Association and the Kansas Hotel and Motel Association, and has continued to be a member of those organizations.

Petitioner has operated the cocktail lounge, first in the Continental Host Motel and then in the Downtowner Motor Inn, continuously since 1966. Enterprises leased the portion of the annex, not leased to Michael, to a beauty shop operation for $125 per month.

Enterprises realized gross revenues and profits and losses from the motel operation in the following amounts for its fiscal years ended November 30 as follows:

| FYE Nov. 30— | Gross room rentals | Restaurant revenues | Combined motel and restaurant profit (loss) |
|---|---|---|---|
| 1971 .......... | $45,065.80 | $40,491.38 | $10,474.06 |
| 1972 .......... | 241,561.27 | 138,199.82 | 41,271.86 |
| 1973 .......... | 195,294.04 | 145,735.31 | (4,976.40) |

The profit or loss from the motel operation was allocated between the room rental and restaurant operations on petitioner's tax returns as follows for the years indicated:

| FYE Nov. 30— | Gross income | | Net profit or (loss) | |
|---|---|---|---|---|
| | Motel | Cafe | Motel | Cafe |
| 1971 ...... | $45,619.77 | $40,491.38 | $17,851.78 | ($7,377.72) |
| 1972 ...... | 248,335.62 | 138,199.82 | 65,496.81 | (24,224.95) |
| 1973 ...... | 231,415.34 | 145,735.31 | 19,092.05 | (24,068.45) |
| 1974 ...... | 212,264.89 | 186,382.34 | (4,732.42) | (23,792.63) |

On his tax return for 1971, petitioner reported no rental income except $600 rental for a residential house in no way connected with the motel property. On this return, petitioner claimed depreciation on the motel equipment and real property in the amounts of $16,022 and $13,029.50, respectively.

For the year 1972, petitioner reported rentals of $44,840, composed of the following items:

| | |
|---|---|
| Motel and cafe ............................................... | $38,000 |
| Annex (liquor store and barber shop) .................. | 2,040 |
| Lounge ....................................................... | 4,800 |
| Total ....................................................... | 44,840 |

On his 1972 Federal income tax return, petitioner claimed

depreciation for motel equipment and motel real property in the amounts of $38,706 and $31,477.94, respectively.

For the year 1973, petitioner on his Federal income tax return reported rental income of $63,930 consisting of the following items:

| | |
|---|---:|
| Motel and cafe | $57,000 |
| Annex | 2,130 |
| Lounge | 4,800 |
| Total | 63,930 |

For the year 1973, petitioner deducted depreciation for motel equipment and motel real property in the amounts of $39,139 and $31,477.94, respectively.

All of petitioner's equipment leased to Enterprises had a useful life of 10 years or less.

On his 1971 Federal income tax return, petitioner claimed an investment credit of $4,066. This investment credit was computed on equipment acquired by petitioner in August 1971 which was included in the furnishings and equipment leased to Enterprises for the operation of the motel, including 106 television sets with a cost of $30,132.65. On his 1972 Federal income tax return, petitioner claimed an investment credit of $74 computed on similar equipment, and for 1973, an investment credit of $141. Petitioner claimed a carryback of a part of the 1973 investment credit to 1970 and a part to 1971 since petitioner's 1973 tax return reported a loss.

Respondent, in his notice of deficiency to petitioner for the years 1970 and 1971, determined:

> In the tax year 1971, you engaged in a transaction with Fegan Enterprises, Inc., a corporation owned or controlled by you and other members of your family, whereby you built a motel and leased it to the corporation on terms not at arm's-length. Under section 482 of the Internal Revenue Code, additional income of $41,692.00, as computed below, is allocated to you in order to clearly reflect your income.

The computation following this statement added to depreciation claimed by petitioner in 1971 on the motel, 3 percent of the depreciable cost basis in the motel for 153 days of the year. Since no rental income was reported on the return, the total amount so arrived at was the determined rental income of $41,692.

In his notice of deficiency to petitioner for the years 1972 and 1973, respondent made the same determination with respect to

allocation of income to petitioner as he made in his notice to petitioner for the year 1971. Using the depreciation claimed for the entire year and 3 percent of petitioner's depreciable cost basis for the entire year, respondent determined rental income of $100,538 for petitioner for 1972 and $100,789 for 1973 from which he subtracted the rental income of $44,300 and $63,300, respectively, reported on petitioner's returns. The resulting increased taxable income was $56,238 and $37,489 for 1972 and 1973, respectively.

Respondent in the notices of deficiency also disallowed the investment credits claimed by petitioner with respect to furnishings and equipment which were in the motel with the following explanation:

It is determined that property on which you claimed investment credit for 1971, 1972 and 1973 does not qualify for credit under section 48 of the Internal Revenue Code because it is rental property held for investment and not used in your trade or business. Accordingly, investment credit of $4,066.00 claimed for 1971, and credits of $28.00 for 1970 and $70.00 for 1971, claimed as carrybacks from 1973, are not allowable.

A similar explanation of disallowance of claimed investment credits to petitioner was made in the notice of deficiency issued to him for the years 1972 and 1973.

## OPINION

Section 482[2] authorizes the Commissioner to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among commonly owned or controlled organizations, trades, or businesses, whether or not incorporated, if he deems such distribution or allocation necessary in order to prevent evasion of taxes or clearly to reflect income of any of the organizations, trades, or businesses. It is under this section that respondent proposes to allocate to petitioner, as rental income, a greater amount than was paid or due to petitioner by Enterprises under the lease between Enterprises and petitioner.

---

[2]SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Petitioner takes the position that the allocation of additional rent to him is improper because (1) he is an individual and not an organization, trade, or business as referred to in section 482; (2) that within the meaning of section 1.482–1(b)(1), Income Tax Regs.,[3] petitioner's lease with Enterprises meets the standards of a lease which would be entered into by an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer; and (3) that respondent's adjustment is unreasonable, arbitrary, and capricious because it is a purported allocation or apportionment of income to petitioner which does not in truth and in fact exist but rather is created by respondent's allocation.

Respondent contends that (1) section 482 does permit a distribution or allocation of income from a related organization to an individual who is in a trade or business and that petitioner's rental of property to Enterprises was, within the meaning of section 482, a trade or business; (2) that petitioner has not shown that the lease entered into between petitioner and Enterprises, whereby petitioner leased the motel property to Enterprises, met the standards of a lease which would have been entered into between uncontrolled taxpayers dealing at arm's length; and, finally, (3) that in fact there was gross income received by Enterprises which was properly allocable to petitioner, but, in any event, this Court in *Edwards v. Commissioner*, 67 T.C. 224 (1976), departed from the view it had previously taken that it was necessary for the entity from which income is allocated to have gross income as a result of the transactions involved.

Clearly, Enterprises was controlled by petitioner who owned approximately 76 percent of its stock. Petitioner does not argue that he did not in fact control Enterprises. Petitioner leased to Enterprises all the real property, equipment, and furnishings

---

[3]Sec. 1.482–1 Allocation of income and deductions among taxpayers.

(b) *Scope and purpose*. (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

needed to operate a 100-room motel. On the basis of these facts, we consider the rental by petitioner of this motel property to Enterprises to constitute a trade or business within the meaning of section 482. The facts here are similar to the facts in *Cooper v. Commissioner*, 64 T.C. 576, 580 (1975), in which we held that individuals who permitted a corporation to use assets owned by them without charging rent were in fact in a trade or business within the meaning of section 482. Here, petitioner actually had a lease with Enterprises under which the rights of the lessor and the lessee were spelled out in detail. Clearly, petitioner's lease of properties to Enterprises in this case constitutes a trade or business within the meaning of section 482. *Ach v. Commissioner*, 42 T.C. 114, 124–125 (1964), affd. 358 F.2d 342 (6th Cir. 1966). See also *Rubin v. Commissioner*, 56 T.C. 1155 (1971), affd. per curiam 460 F.2d 1216 (2d Cir. 1972). We therefore hold that under the circumstances here present petitioner's activities were an unincorporated business to which income might be allocated from another entity controlled by him under section 482.

In support of his argument that his lease of property to Enterprises meets the standards of a lease which might have been executed between two uncontrolled taxpayers dealing at arm's length, petitioner relies entirely on his testimony that in arriving at the amount of rent to be paid by Enterprises he relied on the demand and economic feasibility report which he had obtained in September 1969 prior to commencing construction of the motel. Petitioner testified that he represented both Enterprises and himself in determining the rental to be charged Enterprises for the motel property. Petitioner, at one point in his testimony, stated that he discussed the lease with his sons, who were also officers of Enterprises, but stated that he made the decision with respect to the lease both for himself and Enterprises. Therefore, in order to sustain his position with respect to the lease being comparable to one that would be entered into between persons dealing at arm's length, petitioner would have to show that the rental charged was a fair amount of rental for the type of property rented under the type of lease entered into and that a charge comparable to that made in this lease was made for comparable property, or would have been made by a lessor unrelated to the lessee.

Section 1.482–2(c), Income Tax Regs.,[4] provides the standards which must be met in cases where property owned by a taxpayer

---

[4]Sec. 1.482–2 Determination of taxable income in specific situations.

(c) *Use of tangible property*—(1) *General rule.* Where possession, use, or occupancy of tangible property owned or leased by one member of a group of controlled entities (referred to in this paragraph as the owner) is transferred by lease or other arrangement to another member of such group (referred to in this paragraph as the user) without charge or at a charge which is not equal to an arm's length rental charge (as defined in subdivision (i) of subparagraph (2) of this paragraph), the district director may make appropriate allocations to properly reflect such arm's length charge. Where possession, use, or occupancy of only a portion of such property is transferred, the determination of the arm's length charge and the allocation shall be made with reference to the portion transferred.

(2) *Arm's length charge.* (i) For the purposes of this paragraph, an arm's length rental charge shall be the amount of rent which was charged, or would have been charged for the use of the same or similar property, during the time it was in use, in independent transactions with or between unrelated parties under similar circumstances considering the period and location of the use, the owner's investment in the property or rent paid for the property, expenses of maintaining the property, the type of property involved, its condition, and all other relevant facts. If neither the owner nor the user was engaged in the trade or business of renting property, the arm's length rental charge for the taxable year shall be deemed to be equal to the amount specified in subdivision (ii) or (iii) of this subparagraph, whichever is appropriate, unless the taxpayer establishes a more appropriate charge under the standards set forth in the first sentence of this subdivision. For purposes of this subdivision, an owner or user shall be considered to be in the trade or business of renting property if it engages in the trade or business of renting property of the same general type as the property in question to unrelated parties. An owner or user will not be considered to be engaged in the trade or business of renting property of the same general type solely on the basis of casual or infrequent rentals of property which is predominantly used in its trade or business.

(ii) Except as otherwise provided in subdivision (iii) of this subparagraph the amount referred to in subdivision (i) of this subparagraph for the taxable year shall be equal to the sum of the following amounts attributable to the property: *(a)* The amount which bears the same ratio to the depreciable basis of the property divided by the total useful life of the property in the hands of the owner as the number of days which the property is owned by the owner (in the taxable year) bears to 365. For this purpose, the depreciable basis of the property shall be the original cost or other basis of the property in the hands of the owner adjusted by items properly chargeable to capital account (as provided in sec. 1.1016–2) and reduced by estimated salvage value, but without adjustment for exhaustion, wear and tear, obsolescence, etc. (as provided in sec. 1.1016–3). For this purpose, total useful life, depreciable basis, and salvage value shall be estimated on the basis of facts and circumstances known to exist at the time that possession, use, or occupancy of the property was transferred to the user. However, if substantial adjustments to the adjusted basis other than for exhaustion, wear and tear, obsolescence, etc., are made, total useful life, depreciable basis, and salvage value shall be redetermined on the basis of the facts and circumstances known to exist as of the time at which such adjustments become substantial. For purposes of the preceding sentence, adjustments shall be considered substantial if at any time the total adjustments subsequent to the time at which the property was transferred to the user or subsequent to the most recent redetermination under this subdivision *(a)*, whichever is later, exceeds 25 percent of the depreciable basis of the property.

(b) The amount which bears the same ratio to 3 percent of the depreciable basis of the property (as determined in subdivision (ii)*(a)* of this subparagraph) as the number of days which the property is owned by the owner (in the taxable year) bears to 365.

(c) The amount of all expenses directly and indirectly connected with the property paid or accrued by the owner of the property during the taxable year. Such expenses include real estate, personal property, or other taxes on the property, expenses of maintenance and repair, cost of utilities, management expenses, and other similar expenses. Such amount does not include interest expense.

(d) The amount of all expenses directly and indirectly connected with the possession, use, or occupancy of the property by the user paid or accrued by the owner during the taxable year. Such expenses include services rendered in connection with the transfer of the property within the meaning of paragraph (b)(8) of this section and other similar expenses. For purposes of this subdivision any capital expenditures, within the meaning of section 263 of the Code, with respect to

is leased to a controlled entity in order to establish that the amount of rental charged is equal to that which would be charged in an arm's-length transaction. This regulation provides that an arm's-length rental charge shall be the amount of rent which was charged or would have been charged for use of similar properties by parties who were unrelated. It then provides an amount which shall be deemed to be equal to a rental charge between unrelated parties dealing at arm's length where a taxpayer does not establish a more appropriate charge based on an amount charged, or that would have been charged, in an independent transaction.

Petitioner here has made no showing of amounts charged by other lessors of motel properties to an entity operating a motel. The only evidence in this record bearing in any way on what would be the rental charge between parties dealing at arm's length is petitioner's testimony that he was negotiating with Royal Inns with respect to leasing the motel property to Royal Inns, but decided against the transaction because of his doubt as to the financial stability of the proposed lessee. Petitioner testified that Royal Inns was not interested in renting the cafe portion of the motel, but the discussion with respect to rental of the motel room area to Royal Inns was on the basis of 27 percent of the amount received by Royal Inns from rental of rooms. On this basis, using the estimates in the September 1969 study, petitioner would have received rental of $67,230 from Royal Inns if a 65-percent occupancy of the motel was attained and $75,870 if a 70-percent occupancy was attained.[5] In addition to this, petitioner would have received whatever an appropriate rental was for the restaurant portion of the facilities. This compares to a maximum rental petitioner could have received under the lease he entered into with Enterprises based on a 65-percent occupancy of the motel of $50,800, and $69,100 based on a 70-percent occupancy.

Petitioner testified to his hope that occupancy would, through the years, become higher than the 65-percent and 70-percent ratio. However, the report is clear that in the opinion of the

the possession, use or occupancy of the property by the user incurred in any taxable year shall be deemed to be expenses paid or accrued by the owner during the taxable year to the extent that they may be properly amortized for the taxable year.

[5] As set forth in our findings, the study estimated receipts from motel room rentals of $249,000 at 65-percent occupancy and $281,000 at 70-percent occupancy.

preparer the highest occupancy that might reasonably be anticipated was 65 or 70 percent. The report pointed out that there was very little tourism in Junction City during the winter months and even suggested that the motel be constructed so that 30 of the 100 rooms could be closed off during the winter months. Also, there is nothing whatsoever in this record to show that the 27 percent of room rental plus an amount which might feasibly be received from rental of the restaurant would have been a reasonable rental from the motel.

Also, it should be noted that the basic rental provided for in the lease of the property to Enterprises of $3,800 per month was exactly the amount petitioner was required to pay on the mortgage he had on the property, so that he was assured of receiving from the motel lease his cash payment to the bank each month with respect to the mortgage on the motel property. Petitioner argues that the two are not related since the lease was negotiated prior to his knowing the exact amount of the payment on the mortgage. The record shows that the lease was entered into on December 1, 1971, which was clearly subsequent to the time petitioner knew exactly the amount he would be required to pay on the mortgage. However, the record shows the terms of the lease were agreed to several months prior to December 1, 1971. From the evidence, it appears that by the time the motel was opened on August 1, 1971, petitioner had a reasonable idea of the amount of loan he would take down and the amount of his monthly payment on the loan, and certainly by September 16, 1971, when the formal opening of the motel occurred, he knew the exact amount of such payment. Although petitioner testified that the amount of the minimum rental was not set specifically to cover his cash outlay on the mortgage, the reasonable inference from the record as a whole is that the minimum rental in the lease of the motel to Enterprises was set by petitioner to approximate his cash outlay with respect to his loan on the motel property. While such a provision might be made in an arm's-length transaction if other adequate rental was provided for, it is the type of transaction which, coupled with the other provisions of the lease here involved, indicated that the rental charge was not that which would have been arrived at in an arm's-length transaction.

Other than the showing of the proposed transaction with Royal Inns, which was not consummated, petitioner made no

showing of amounts charged, or that would have been charged in a transaction between unrelated parties, similar to the transaction between petitioner and Enterprises.

The amount of rental which petitioner might reasonably anticipate receiving had the projection contained in the feasibility report been attained, as compared to the value and the nature of the property leased, in no way indicates the presence of an arm's-length transaction. The record shows a total cost of the assets rented to Enterprises of $1,046,028.88. These assets included equipment with a useful life in all instances of less than 10 years, with a cost to petitioner of $223,425.46. The rental which petitioner was to receive from the motel properties, even had the estimated level of income been attained by Enterprises, on its face appears inadequate for assets of the type rented at the cost of the assets here shown.

Petitioner argues that since under the provisions of the lease the interior repairs were to be made by the lessee and taxes and insurance were to be paid by the lessee, the amount of rental should not be as great as in a different form of lease. In reaching our conclusion that petitioner has failed to show that the rental provided for in the lease to Enterprises was an amount that would have been charged by a lessor dealing at arm's length with a lessee, we have taken these factors into consideration. Certainly, as recognized in respondent's regulations (n. 4 *supra*), by adding these types of expenses paid by the lessor into the computation of a fair rental, the rental amount for a lease under which the lessor paid such expenses should be greater than one under which the lessee paid these expenses. However, petitioner here has failed to show that the rental he charged to Enterprises was comparable to rent that would have been charged in an arm's-length transaction under a lease providing that the expenses of taxes, insurance, and interior repairs be paid by the lessee.

Petitioner also argues that the lessee paid the utilities on the cocktail lounge rented to petitioner's business and the store rented to his son's business. However, the terms of the lease do not indicate that this was required.

On the basis of this record as a whole, we conclude that petitioner has failed to establish that the rental he charged Enterprises for the motel properties was an amount which

would have been charged by a lessor dealing at arm's length with a lessee with respect to rental of comparable properties.

Finally, petitioner contends, relying on *Tennessee-Arkansas Gravel Co. v. Commissioner*, 112 F.2d 508 (6th Cir. 1940), revg. a Memorandum Opinion of this Court, and *Huber Homes, Inc. v. Commissioner*, 55 T.C. 598 (1971), that the adjustment determined by the respondent here is the creation of income rather than the distribution, apportionment, or allocation of gross income between controlled entities. Although *Huber Homes, Inc. v. Commissioner, supra,* relied on language in *Tennessee-Arkansas Gravel Co. v. Commissioner, supra,* the factual situation involved in that case is totally different from the factual situation in the instant case. In the *Huber Homes* case, the taxpayer had sold houses to a controlled corporation at less than the fair market value of the houses. The controlled corporation did not resell the houses, thereby producing income from the sale of the property transferred to it by the taxpayer, but rather rented the houses. Although, in an indirect sense, the property purchased produced the controlled corporation's income, it did not directly produce such income as a resale would have. However, the factual situation in the *Tennessee-Arkansas Gravel Co.* case more nearly resembles that here. In that case, at 510, the Circuit Court pointed out that the Commissioner—

made no attempt to allocate any portion of the $51,427.70, representing the gross income of Mississippi [the controlled corporation] in 1934, to petitioner. The record clearly discloses what he did. He simply concluded that petitioner should have charged Mississippi rent upon the equipment for the year 1934, notwithstanding the fact that petitioner neither charged, collected or could have collected rent under its agreement with Mississippi. * * *

The conclusion that the taxpayer in the *Tennessee-Arkansas Gravel Co.* case could not have collected rent was apparently based on the fact that there had been an agreement for payment by the controlled corporation of a rental charge for the equipment of the taxpayer used by it in 1933 of $1,000 a month, but because the operation of the controlled corporation had been at a loss for that year no rent had been paid. In the *Tennessee-Arkansas Gravel Co.* case, at the end of the year 1934, the equipment used by the controlled corporation had been sold to that corporation by the taxpayer, and the taxpayer had reported capital gains on the sale. It is difficult to determine from the *Tennessee-Arkansas Gravel Co.* case the basis on which the

Circuit Court reached the conclusion that a determination of a rental amount for the equipment which the Commissioner had allocated to the taxpayer was not an allocation of any portion of the controlled corporation's gross income.

In any event, in the instant case Enterprises had gross income in each of the years here involved and in two of these years had net income. Certainly, the property leased to Enterprises by petitioner, which was the motel real property and the equipment and furnishings in the motel, was a direct source of the production of that income and that gross income was directly increased by any amount of fair rental for the property that Enterprises was not required to pay to petitioner as rental. In our view, therefore, the instant case is distinguishable from the many cases in which this Court and other courts have held that, under section 482, the Commissioner could not properly allocate to a taxpayer income from a controlled entity unless the transaction between the two was responsible for creating the income allocated.

Many of the cases dealing with whether the allocation by the Commissioner under section 482 was of income actually realized by the controlled entity dealt with interest-free loans. In *Latham Park Manor, Inc. v. Commissioner*, 69 T.C. 199, 209–214 (1977), we specifically departed from the position we had previously taken in a number of cases that unless the production of income by the controlled entity from the transaction with the taxpayer could specifically be shown, no allocation of income by the Commissioner from the controlled corporation to the taxpayer was permissible under section 482. In so doing, we relied, to an appreciable extent, on regulations that had not been in effect at the time some of the opinions of this Court involving the "creation of income" issue had been decided. We specifically held that those cases would no longer be followed insofar as they were contrary to our conclusion in the *Latham Park Manor, Inc.* case. In that case we stated, at pages 215–216, in this regard:

Petitioners ask us to reject the teaching of these courts of appeals' opinions and base our conclusion on *Smith-Bridgman & Co. v. Commissioner*, 16 T.C. 287 (1951); *PPG Industries, Inc. v. Commissioner*, 55 T.C. 928 (1970); and this Court's opinions in *Kerry Investment Co. v. Commissioner, supra*, and *Kahler Corp. v. Commissioner, supra*, all involving loans at less than arm's-length rates. That line of cases enunciates the doctrine that section 482 may not be used to "create" income, i.e., no allocation may be made unless income was produced by the proceeds of the interest-free loan. Those cases also reason that

the lender may not be taxed on interest with respect to a loan where it was not intended that interest be collected. But those Court opinions were written before sections 1.482–1(d)(4) and 1.482–2(a), Income Tax Regs., were issued in 1968, T.D. 6952, 1968–1 C.B. 218, or did not focus on such regulations. Those regulations are dispositive of the instant issue. True, section 482 was not changed before the 1968 regulations were issued, but the Commissioner has a well-recognized authority to alter regulations, despite the absence of any change in the statutory language. *Helvering v. Wilshire Oil Co.*, 308 U.S. 90, 97, 100–101 (1939), revg. 95 F.2d 971 (9th Cir. 1938), affg. 35 B.T.A. 450 (1937); *Continental Oil Co. v. Jones*, 176 F.2d 519, 522 (10th Cir. 1949); *Taubman v. Commissioner*, 60 T.C. 814, 817–818 (1973).

In summary, we conclude that sections 1.482–1(d)(4) and 1.482–2(a)(1), Income Tax Regs., are valid, and we sustain respondent's allocation of interest income to petitioners on the loans they made to MIC, their parent corporation. To the extent our conclusion herein is inconsistent with the opinions in *Smith-Bridgman & Co. v. Commissioner, supra; PPG Industries, Inc. v. Commissioner, supra; Kerry Investment Co. v. Commissioner, supra;* and *Kahler Corp. v. Commissioner, supra,* those opinions no longer will be followed.

[Fn. ref. omitted.]

Although the *Latham Park Manor, Inc.* case dealt with interest-free loans, its rationale is equally applicable to rent-free use of property or use of property at less than a fair rental, particularly since section 1.482–2(c), Income Tax Regs. (see n. 4), dealing with leased property, is just as specific as are the provisions of section 1.482–2(a), Income Tax Regs., dealing with loans or advances, and is part of the same regulation adopted in 1968 by T.D. 6952, 1968–1 C.B. 218. Section 1.482–2(c) in effect provides a net profit of 3 percent of the cost basis to a taxpayer after deduction from a gross rental of depreciation allowable to the taxpayer on the property rented and the direct expenses paid by the taxpayer with respect to that property, such as taxes and insurance. We conclude that section 1.482–2(c), Income Tax Regs., is valid and that the distribution or allocation of income to petitioner made by the Commissioner in this case is in accordance with that regulation. We therefore conclude that the Commissioner did not exceed his authority under section 482 in making the allocation of rental income to petitioner in the instant case. We hold for the Commissioner on the section 482 issue.

Finally, petitioner argues that respondent has failed to make the correlative adjustment required by section 1.482–1(d)(2), Income Tax Regs., in the income of Enterprises, citing *Collins Electrical Co. v. Commissioner*, 67 T.C. 911 (1977). As discussed in some detail in the *Collins Electrical Co.* case, our only

jurisdiction here is over petitioner, and petitioner is the party against whom the primary adjustment has been asserted by respondent. However, as further pointed out in the *Collins Electrical Co.* case, at page 922, it is not our intention that our holding with respect to our jurisdiction in the instant case sanctions double taxation on the same income since, clearly, section 482 does contemplate that when the Commissioner allocates income to one commonly controlled organization he will make a correlative adjustment in the income of the other. As also noted in the *Collins Electrical Co.* case, section 1.482–1(2)(v), Income Tax Regs., specifically provides that the correlative adjustment shall not be considered to have been made where a case is litigated until final determination of the tax liability by Court action. In this case, respondent in his reply brief answers petitioner's argument with the following statement: "As noted in respondent's original brief, any correlative adjustment made necessary by a decision of this Court will be entered in accordance with Treas. Reg. sec. 1.482–1(d)(2) at the appropriate time. *Collins Electrical Company v. Commissioner*, 67 T.C. 911 (1977)."

Section 38 provides for the allowance of a credit against a taxpayer's income tax in an amount determined under the provisions of sections 46, 47, 48, 49, and 50. Section 48 provides the definition of section 38 property. This definition includes tangible personal property with respect to which depreciation is allowable having a useful life of 3 years or more. The property with respect to which petitioner claimed the investment credit clearly falls within this definition.[6] Nothing in section 48 specifically requires that a taxpayer be engaged in a trade or business of leasing property in order to be entitled to the investment credit with respect to such property if the property otherwise meets the requirements of section 38 property set forth in section 48. Inherent in the requirement that the tangible

---

[6]Respondent does not contend that depreciation is not allowable to petitioner on the tangible personal property he rented to Enterprises but, in fact, in the determination in his deficiency notice based his computation on depreciation on that property being allowable.

Sec. 48(c)(3) deals with property used predominantly to furnish lodging. That section provides that such property shall not be treated as sec. 38 property unless it is used by a hotel or motel in connection with the trade or business of furnishing lodging to transients. Respondent makes no contention that the property here involved was not used for furnishing lodging to transients, nor does respondent contend that this property does not fall within the definition of tangible personal property as used in sec. 48.

personal property be property with respect to which depreciation is allowable is the requirement that it be property used in the taxpayer's trade or business or property held for the production of income. Sec. 167(a). We think it clear, under section 48, that if the tangible personal property is property with respect to which depreciation is allowable, it is within the definition of section 38 property. See *Lockhart Leasing Co. v. Commissioner*, 54 T.C. 301 (1970), affd. 446 F.2d 269 (10th Cir. 1971).

Furthermore, under the facts here shown and our longstanding definition of "trade or business" as including under appropriate circumstances the rental of one property, petitioner was in the trade or business of renting the motel properties to Enterprises. See *Hazard v. Commissioner*, 7 T.C. 372, 375 (1946).

Respondent's primary argument here is that section 46(e)(3)[7] denies petitioner any investment credit. Section 46 deals with the determination of the amount of credit allowable. Section 46(e)(3) provides that a credit under section 38 shall be allowed to noncorporate lessors with respect to property leased by such noncorporate lessor only if that property has been manufactured by the lessor or the term of the lease is for less than 50 percent of the useful life of the property. This section, which was added to the Code by Pub. L. 92–178, sec. 108(a), is applicable only to leases entered into after September 22, 1971. Section 1.46–4(d)(1),[8] Income Tax Regs., specifically recognizes the applicable

---

[7]Pub. L. 94–12, sec. 302(a), redesignated sec. 46(d) as 46(e). Therefore, for the years here in issue now, sec. 46(e)(3) was sec. 46(d)(3) and provided as follows:

SEC. 46. AMOUNT OF CREDIT.

(d) LIMITATIONS WITH RESPECT TO CERTAIN PERSONS.—

\*      \*      \*      \*      \*      \*      \*

(3) NONCORPORATE LESSORS.—A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if—

(A) the property subject to the lease has been manufactured or produced by the lessor, or

(B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of rental income produced by such property.

In the case of property of which a partnership is the lessor, the credit otherwise allowable under section 38 with respect to such property to any partner which is a corporation shall be allowed notwithstanding the first sentence of this paragraph. For purposes of this paragraph, an electing small business corporation (as defined in section 1371) shall be treated as a person which is not a corporation.

[8]Sec. 1.46–4 Limitations with respect to certain persons.

(d) *Noncorporate lessors.* (1).In the case of a lease entered into after September 22, 1971, a credit is allowed under section 38 to a noncorporate lessor of property with respect to the leased property only

date by providing that in case of a lease entered into after September 22, 1971, a credit shall be allowed under section 38 to a noncorporate lessor of property only if the property meets the standards as set out in section 46(e)(3) of the Code.

Petitioner argues that since section 46(e)(3) was not the basis of ˙respondent's determination in the notice of deficiency, respondent should not be permitted to argue on brief its application or, in the alternative, the burden is on respondent to show its applicability here. In view of our conclusion with respect to the section 46(e)(3) issue, we need not pass on either of these contentions.

The lease here involved bears an execution date of December 1, 1971. Petitioner, however, argues that effectively there was a lease several months prior to December 1, 1971. He states that this fact is shown by the opening of the motel for business by Enterprises on August 1, 1971, and the official opening of the motel on September 16, 1971, with the motel using the leased property, as well as from petitioner's testimony. Petitioner testified that the terms of the agreement had been reached several months prior to the December 1, 1971, execution date of the lease. He also testified that the agreement had been reached prior to his drawing all of the $350,000 on his loan commitment of $450,000. Petitioner testified that he drew the last of the $350,000 in August or early September 1971. While we have concluded that petitioner knew the approximate payments required on the $350,000 loan prior to the time he drew down the final funds, we have no reason to doubt petitioner's testimony that the terms of the lease agreement had been agreed to by petitioner and Enterprises prior to this final drawing down of the loan funds.

The record further shows that all the property with respect to which the investment credit was claimed for the year 1971 was acquired by petitioner in August 1971 and that this property was in the motel facilities and comprised part of the equipment in the motel having the cost basis of $223,425.46 leased to the motel

---

if—
　(i) Such property has been manufactured or produced by the lessor in the ordinary course of his business, or
　(ii) The term of the lease (taking into account any options to renew) is less than 50 percent of the estimated useful life of the property (determined under sec. 1.46–3(e), * * *

and was used by the motel from August 1, 1971. In our view, the record here shows that an oral lease with respect to the rental to Enterprises of this equipment had been entered into between petitioner and Enterprises prior to September 22, 1971. Nothing in the statute or regulations indicates that the lease entered into prior to September 22, 1971, must be a written lease. In fact, the report of the Senate Finance Committee is clear that an oral lease entered into prior to September 22, 1971, and reduced to writing thereafter, is to be considered for the purposes of section 46(e)(3) as a lease entered into prior to September 22, 1971. This report states in this regard:

> The amendments made by this section of the bill regarding the allowance of the credit to individual lessors are to apply to leases entered into after September 22, 1971. For this purpose, a lease is to be considered entered into prior to that date if there was an enforceable lease agreement in effect prior to that date even though the actual formal lease may not have been executed until after that date. * * * [S. Rept. 437, to accompany H.R. 10947 (Pub. L. 178), 92d Cong., 1st Sess. 44–45 (1971).]

On the basis of this record, we conclude that petitioner is entitled to the claimed investment credit for each of the years here in issue.

*Decision will be entered under Rule 155.*