T.C. Memo. 1997-226


UNITED STATES TAX COURT


INVERWORLD, INC., ET AL., Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]


Docket Nos. 27089-90, 27090-90,    Filed May 12, 1997.
            3441-93,  3442-93,
            3443-93,  3444-93.[1]


<u>Turner P. Smith</u>, <u>Nancy E. Delaney</u>, and <u>Robert D. Whoriskey</u>,

for petitioner in docket No. 27089-90.

<u>Turner P. Smith</u>, <u>Nancy E. Delaney</u>, <u>T. Barry Kingham</u>, and

<u>Robert D. Whoriskey</u>, for petitioner in docket No. 27090-90.

---

[*]    This Supplemental Memorandum Opinion supplements our prior
Memorandum Opinion, <u>InverWorld, Inc. v. Commissioner</u>, T.C. Memo.
1996-301, filed June 27, 1996 (prior opinion).

[1]    The following cases are consolidated herewith for purposes
of trial, briefing, and opinion:  InverWorld, Inc., docket No.
3441-93; InverWorld, Ltd., docket Nos. 27090-90, 3443-93, and
3444-93; and InverWorld Holdings, Inc., docket No. 3442-93.

Turner P. Smith and Nancy E. Delaney, for petitioners in docket Nos. 3441-93, 3442-93, 3443-93, and 3444-93.

Jill Frisch, Peter J. Graziano, and Maria Stabile, for respondent.

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, Judge:  These cases are before us on petitioners' motion pursuant to Rule 161[2] for reconsideration of our prior Memorandum Opinion, T.C. Memo. 1996-301 (prior opinion).  In our prior opinion, as to InverWorld, Ltd. (LTD), we held, inter alia, that LTD was engaged in trade or business within the United States pursuant to section 864(b), that a certain portion of LTD's income was effectively connected with the conduct of such trade or business pursuant to section 864(c), that LTD was liable for corporate income tax pursuant to section 882(a), and that LTD was liable for additions to tax pursuant to sections 6651, 6653, 6655, and 6656.  As to InverWorld, Inc. (INC),[3] we held, inter alia, that income was to be allocated from LTD to INC pursuant to

---

[2]    Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the years in issue.

[3]    For INC's taxable years ended June 30, 1987, 1988, and 1989, INC was joined in the consolidated income tax returns filed by InverWorld Holdings, Inc. (Holdings), which was the owner of all of the outstanding stock of INC.  Accordingly, respondent's income allocations to INC pursuant to sec. 482 affect the income tax liability of Holdings.  For convenience and clarity, we make reference to INC only and include Holdings in such references.

section 482, and that INC was liable for additions to tax pursuant to sections 6651, 6653(a), 6656, and 6661.

FINDINGS OF FACT

We incorporate into this Opinion by reference the findings of fact in our prior opinion. Additionally, we restate below certain of those findings that are relevant to the issues presented by petitioners' motion for reconsideration. Furthermore, we set forth below certain supplementary findings of fact that were not set forth in our prior opinion but are, however, based on the record of the trial of the instant case and relevant to our analysis below.

Currency Exchange Transactions Income

LTD engaged in two types of currency exchange transactions.

a. Currency Swaps

LTD arranged for its clients currency swaps, which were contracts in dollar futures. In a currency swap, LTD and a client entered into a contract in which LTD agreed to sell U.S. dollars to the client for Mexican pesos at some future date. The sale price for the dollars was determined in accordance with the interest rate negotiated between LTD and the client. LTD's gross receipts consisted of commissions that it received from Bank of America and United States Trust for arranging the currency swaps. LTD's direct costs were the commissions it paid out for arranging the currency swaps. LTD stopped arranging currency swaps on September 1, 1984.

The gross receipts and direct costs relating to LTD's "Commissions on Foreign Exchange" are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1985 | $54,386 | $24,750 |

b.   Currency Transactions

The second category of currency exchange transactions in which LTD engaged was the sale and purchase of U.S. dollars on behalf of clients.  LTD maintained a bank account at Frost Bank in San Antonio that LTD used to collect deposits from clients. LTD called the Frost Bank account the "client clearing account" or "clearing account".  LTD engaged in four types of currency (U.S. dollar-peso) transactions described as follows:

i.   LTD arranged sales of U.S. dollars to a client in exchange for Mexican pesos.  The client contacted a promoter in Mexico, who quoted an exchange rate for pesos to dollars.  Once the client and the promoter agreed on a rate, the promoter performed the exchange operation from his office in Mexico.  The client made pesos available in Mexico to be exchanged, and the promoter documented receipt of the pesos.  The promoter then converted the pesos to dollars at a Government-authorized Mexican exchange house.  Once the exchange was executed, the promoter directed that the dollars be wired to the clearing account in San Antonio to be credited to the client's account.  The transaction appeared as a credit on the client's monthly statement.  LTD

charged the client a fee equal to the difference between the exchange rate obtained from the Mexican exchange house and the rate quoted and agreed to by the client.

ii. LTD sold dollars from its own account to a client in exchange for pesos. LTD transferred money, usually by wire, from the clearing account to the client's designated financial institution. The transaction appeared on LTD's books as a debit in the clearing account.

iii. LTD arranged purchases of dollars from a client in exchange for pesos. LTD verified that the client had sufficient funds on deposit in its account with LTD. The client then withdrew dollars from its LTD account to exchange with pesos obtained by LTD. The transaction appeared as a debit on the client's monthly statement.

iv. LTD purchased dollars from a client in exchange for pesos and deposited the dollars into LTD's own account. The transaction appeared on LTD's books as a credit to the clearing account.

Only transaction type (i) above involved the performance of personal services in Mexico by a promoter. Specifically, in transaction type (i), the promoter handled the exchange by converting pesos to dollars at a Mexican exchange house. In transactions types (ii), (iii), and (iv), the currency transactions were handled by INC in San Antonio with pesos being deposited with or received from Mexican institutions and dollars

being deposited with or withdrawn from U.S. institutions, including Frost Bank in San Antonio, where the clearing account was maintained.  Additionally, INC maintained records of LTD's and its clients' positions with respect to such currency transactions.

LTD ceased to conduct the currency transactions in its own name as of its taxable year ended June 30, 1989.  LTD's currency transaction income derived from, inter alia, the fees, which were reflected in the exchange rates, that LTD charged its clients. The gross receipts and direct costs relating to LTD's income from "Currency Transactions" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1985 | [1]$531,003 | – 0 – |
| 1986 | 745,001 | 130,485 |
| 1987 | [2]434,867 | 16,125 |
| 1988 | [3]232,426 | 16,863 |

[1]This amount is net of expenses.  Neither the revenue agent's workpapers nor Deloitte's workpapers reveal the gross receipts.

[2]The amount of gross receipts includes a check of $11,361 from the Guadalajara office representing its contribution to profits.

[3]The amount of gross receipts includes a check of $16,426 from the Guadalajara office representing its contribution to profits.

c.    Client Incorporation and Trust Creation Fees

LTD offered its clients the option of establishing offshore corporations and trusts to hold their investments.  Each client signed a discretionary authorization granting LTD the power to invest the funds held by the client's corporation or trust.

To establish an offshore corporation or trust for a client, a promoter in Mexico completed a form listing the client's choice of jurisdiction, and in the case of an offshore corporation, its name, and the names of those individuals to be appointed directors. The form was then sent by the promoter to INC, which passed the information to outside lawyers or fiduciaries qualified to perform the necessary paperwork in the chosen jurisdiction.

The incorporation package completed by the lawyers or fiduciaries was then returned to INC, which returned the package to the client in Mexico. LTD's role, through the promoters, was to provide the counseling on the structure and features of the various incorporation options. Board of directors' meetings for at least two companies incorporated by LTD clients were held at INC's offices in San Antonio. LTD's clients used as their address the address of INC's offices in San Antonio.

Clients establishing an offshore corporation or trust were charged fees for the service, which were paid out of their accounts. LTD charged the clients an "opening expense", which consisted of LTD's fee and fees for third party lawyers and fiduciaries, and an "annual expense". LTD's direct costs were its payments to the third party lawyers and fiduciaries, document fees, commissions, and "incorporation expenses". The gross receipts and direct costs relating to LTD's "Client Incorporation Fees" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1986 | $147,951 | $18,286 |
| 1987 | 363,014 | 126,855 |
| 1988 | 290,518 | 161,037 |
| 1989 | 404,286 | 227,697 |

OPINION

A.    Currency Exchange Transactions Income

In our prior opinion, we found that LTD engaged in two types of currency exchange transactions:  currency swaps, which were contracts in dollar futures, and currency transactions, which included the sale and purchase of U.S. dollars on behalf of clients.  We found that LTD engaged in four types of currency transactions.

Petitioners request that we reconsider our findings that LTD engaged in currency transaction types (ii) through (iv). Petitioners argue that the evidence at trial shows that there was in fact only one type of currency transaction (type (i)). Petitioners state that they do not believe there is testimony or documents to suggest that any of the transaction types (ii) through (iv) occurred and therefore request that such transactions be stricken from our findings of fact.

We found in our prior opinion that, during 1984, LTD and INC engaged the services of the accounting firm of Deloitte Haskins & Sells (Deloitte), which performed a separate audit of each company and a consolidated audit of LTD and subsidiaries for each taxable year ended June 30, 1984 through 1989.  The parties

submitted as joint exhibits workpapers produced by Deloitte in its audit of LTD and INC, including analysis files, general files, permanent files, tax service files, Auditors' Reports, Report Records, draft and Report Copies of Consolidated Financial Statements, and supporting documents.

In our prior opinion, our findings of fact regarding the currency transactions were based upon the Deloitte workpapers, which contained a description of four types of currency transactions. The Deloitte workpapers were offered and entered into evidence at trial without any objection by petitioners. Consequently, we are satisfied that the record in the instant case supports our finding that LTD engaged in the four types of currency transactions described.

Petitioners further request that we reconsider our holding that, because petitioners did not provide an "apportionment scheme" for the currency exchange transactions income, all of LTD's income from currency transactions constitutes income from sources within the United States. Petitioners contend that none of LTD's receipts from currency transactions should be deemed income from sources within the United States because the weight of the evidence established that INC had only the most marginal ministerial involvement in any aspect of the currency transactions. Accordingly, petitioners argue that there is no need to apportion between INC's role and that of LTD's because INC's role is immaterial.

As we see petitioners' arguments, we think that they fail to appreciate our reference in our prior opinion to an "apportionment scheme."  In our prior opinion, we held that LTD's income from currency exchange transactions was characterized as "compensation for personal services performed both in the United States and outside the United States and is treated as income from sources partly within and partly without the United States."  We next stated, "Petitioners, however, did not provide an apportionment scheme for the currency exchange transactions income."

By our reference to an "apportionment scheme", we meant to address petitioners' failure to establish the extent to which income items were derived either from services performed inside the United States, on the one hand, or from services performed outside the United States, on the other hand.  Our reference to an apportionment scheme was not meant to imply that we were addressing an apportionment of income items between LTD and INC.  By that reference, we meant only that petitioners had not set forth a methodology for ascertaining whether income items were derived from inside or outside the United States.  Based on our review of the record, we concluded in our prior opinion that two checks from LTD's Guadalajara office, representing its contribution to profits, were income items which "derived directly from the Guadalajara office's currency operations."  The record, however, does not establish that the remaining currency

transactions income (other than the two items of income from the Guadalajara office) was from sources outside the United States. Petitioners bear the burden of proving that the income derived from sources outside the United States, Rule 142(a), and have not met that burden.  Accordingly, we do not reconsider our holding that "the remaining currency exchange transactions income is treated as income from sources within the United States."

Petitioners also argue that the currency exchange transactions income should not be taxed as effectively connected income pursuant to section 864(c) because INC's role in the transactions was only as a bookkeeper, not as "a material factor in the realization" of LTD's income.  Petitioners contend that the act of contacting institutions for exchange rates is mistakenly attributed to INC when in fact that was the role of the promoter in Mexico.

Contrary to petitioners' argument, we believe that our prior opinion correctly attributes to INC the act of contacting institutions for exchange rates.  In our prior opinion, we concluded that the activities of LTD's trade or business relating to LTD's U.S. source income included "contacting institutions for exchange rates and depositing or withdrawing dollars or pesos." INC was involved in making those contacts on behalf of LTD.  As we stated in our prior opinion, we were addressing the U.S. source income of both types of currency exchange transactions that LTD performed:  currency swaps and currency transactions.

LTD's currency swap income consisted of commissions from Bank of America and United States Trust for arranging the currency swaps, and LTD paid INC to render services to LTD's clients on behalf of LTD.  At trial, Jose Zollino, treasurer and a director of INC, testified that, at INC's office in San Antonio, Pablo Cerrilla, who was in charge of operations for INC, registered "all" of the foreign exchange transactions, which included currency swaps.  Additionally, at trial, George Dooley, INC's controller for approximately 4 years, testified that, at INC's office in San Antonio, Jose de Abiega worked on foreign exchange transactions, which included currency swaps.  As LTD's currency swap income consisted of commissions from Bank of America and United States Trust and as INC handled the currency swaps for LTD's clients, we are satisfied that the record in the instant case shows that INC contacted Bank of America and United States Trust to obtain exchange rates and to arrange the currency swaps.  Accordingly, based on the record, we conclude that the activities of LTD's trade or business relating to its U.S. source currency exchange transactions income included, inter alia, contacting institutions for exchange rates and that INC was engaged in making those contacts on LTD's behalf.

As to LTD's U.S. source currency exchange transactions income, we held in our prior opinion that the activities of LTD's trade or business were "a material factor in the realization of the income" within the meaning of section 864(c)(2)(B).

Petitioners argue in their motion that, because INC's role in the currency exchange transactions was "as a bookkeeper only", such bookkeeping activities do not constitute, as to LTD's trade or business, "a material factor in the realization of the income" within the meaning of section 864(c)(2)(B). We do not agree. Petitioners do not argue that INC rendered no services with respect to LTD's currency exchange transactions. Accordingly, we conclude that petitioners' characterization of INC's activities as mere bookkeeping does not preclude our holding that, as to LTD's trade or business, such activities were a material factor in the realization of the currency exchange transactions income.

In deciding whether the activities of LTD's trade or business, as carried out on its behalf by INC, were a material factor in the realization of LTD's currency exchange transactions income, we consider whether LTD's income was accounted for through LTD's trade or business under all of the circumstances. See sec. 864(c)(2). The activities of LTD's trade or business relating to the currency swap income included contacting Bank of America and United States Trust for exchange rates and arranging the swaps with those institutions. The activities of LTD's trade or business relating to the currency transactions income included effecting the exchange of currencies by depositing or withdrawing dollars or pesos, and maintaining records of LTD's and its clients' positions with respect to such currency transactions. As to such income, we conclude that the activities of LTD's trade

or business were "a material factor in the realization of the income" within the meaning of section 864(c)(2)(B). Consequently, we do not reconsider our holding that LTD's U.S. source currency exchange transactions income is effectively connected income pursuant to section 1.864-4(c)(5)(vi)(b), Income Tax Regs., and section 864(c)(2)(B).

B.    Client Incorporation and Trust Creation Fees

Petitioners request that we reconsider our finding in our prior opinion regarding the client incorporation fees that "the incorporation package completed by the lawyers or fiduciaries was then returned to INC, which returned the package to the client in Mexico."  Petitioners contend that the incorporation packages were returned not to the client in Mexico but rather to the promoters, who then dealt directly with their clients.  Our finding was based upon petitioners' proposed finding in their opening brief, which was supported by the record.  The proposed finding states:  "The incorporation package, completed by these lawyers and fiduciaries, was then returned to San Antonio.  From there, it was forwarded back to the client in Mexico."  Petitioners' proposed finding of fact makes no mention of promoters in the process of sending the incorporation package from INC to the client in Mexico.  Accordingly, we do not reconsider such finding.

Additionally, petitioners request that we reconsider our holding that LTD's income from client incorporation and trust

creation was from sources within the United States.  Petitioners argue that the income was from sources outside the United States because the promoters provided the counseling, the third party lawyers and fiduciaries performed the incorporation and trust creation services, and INC only passed information among the parties.

For its services of client incorporation and trust creation, LTD charged its clients:[4]  (1) an "opening expense", which consisted of LTD's fee and fees for third party lawyers and fiduciaries, and (2) an "annual expense".  Petitioners did not offer any evidence establishing the amounts received and paid by LTD as fees for third party lawyers and fiduciaries.  Moreover, petitioners did not offer a methodology for apportioning or attributing LTD's income between LTD's fee and the fees for third party lawyers and fiduciaries.  Furthermore, the record does not provide sufficient information to establish on our own the amount of income that should be apportioned to each source.[5] Petitioners bear the burden of proving that the income derived

---

[4]   As we noted in our prior opinion, the record reveals instances in which LTD dealt with "related" or favored clients who were charged lower or no fees.

[5]   The record contains LTD's charges for opening expenses and annual expenses but does not contain a breakdown of the "opening expense" between LTD's fee and the fees for third party lawyers and fiduciaries.  As to LTD's expenses, the record either does not contain a breakdown of incorporation expenses between fees for third party lawyers and fiduciaries and document fees or does not establish the nature of the "incorporation expenses".

from sources outside the United States, Rule 142(a), and have not met that burden. Accordingly, we do not reconsider our holding that LTD's income from client incorporation and trust creation is to be treated as income from sources within the United States.

C. Pace Investments Income

In our prior opinion, we found that LTD's Pace investments constituted a specialized mechanism for clients to draw upon their unused lines of credit with Mexican financial institutions. In their motion, however, petitioners ask the Court to reconsider our finding and to adopt instead petitioners' proposed finding of fact that "the Pace investment involved merely the purchase of certificates of deposit issued by the foreign branches of Mexican banks".

In our prior opinion, our findings regarding the Pace investments were based upon the Deloitte workpapers, which contained a description of the handling of the Pace investments. As we stated, supra, the Deloitte workpapers were offered and entered into evidence at trial without any objection by petitioners. We are satisfied that the record in the instant case establishes that the Pace investments constituted a specialized mechanism for clients to draw upon their unused lines of credit with Mexican financial institutions. Accordingly, we do not reconsider such finding.

Additionally, petitioners argue that, because the Pace investments interest derived from Mexican banks, the interest

spreads earned by LTD on Pace deposits should constitute income from sources outside the United States, none of which is effectively connected to a U.S. trade or business. In our prior opinion, we held that LTD's Pace investments income "represented compensation for services rendered in San Antonio in arranging the Pace investments." As petitioners' argument presumes that the Pace investments income is interest income, as opposed to service income that we found it to be, we find that petitioners' argument has no merit. Accordingly, we do not reconsider our holding with respect to the Pace investments income.

D.  Section 482 Allocations

In their motion, petitioners ask the Court to reconsider the section 482 allocations as to four types of income. We note that LTD paid INC an annual fee for services rendered to LTD. Petitioners, however, did not establish the amounts that INC earned for each individual investment product. Consequently, in our prior opinion, for purposes of section 482, we compared LTD's annual payment to INC with the sum of the arm's-length charges calculated for the services INC rendered to LTD. Turning to petitioners' motion, we address the first two types of income together.

1.  Currency Fund and FEIM Fund Fees

Petitioners contend that, as to the Currency Fund and the FEIM Fund, the Court's methodology has the consequence of allocating to INC amounts which exceed the fees or commissions

that LTD actually received, even on a gross basis, from its clients. Petitioners argue that the law does not permit allocation from a parent to a subsidiary of an amount that is more than the amount that the parent itself actually received. Petitioners argue that such an allocation would constitute the creation, rather than the allocation, of income. Petitioners also contend that the allocations are inconsistent with our stated intention to allocate only the "fees that LTD charged its unrelated clients" because those charges represented the arm's-length charge within the meaning of section 1.482-2(b)(3), Income Tax Regs.

Petitioners argue that the maximum allocation to INC should be the net amount of revenues actually received by LTD for placing the client funds with third parties. Petitioners contend that, as respondent's notice of deficiency used a net figure, viz, LTD's income after direct expenses, in making the original section 482 allocations, respondent acknowledges that a allocation of gross receipts is not justified. Alternatively, petitioners contend that even an allocation of the net amount of revenues is "excessive", arguing that the evidence shows that INC did nothing to "manage" the deposits and only made "bookkeeping entries". As a final alternative argument, petitioners argue that the FEIM Fund allocation from LTD to INC should be reduced to zero because of our finding that "INC's only role was to arrange for transfer of the client funds to Merrill Lynch in

Luxembourg and to include a monthly statement of the client's allocated share of the fund value".

We first examine petitioners' argument that the section 482 allocations lead to the "creation" of income. We have previously held that Smith-Bridgman & Co. v. Commissioner, 16 T.C. 287 (1951), and its progeny, which enunciated the doctrine that section 482 and its predecessor may not be used to "create" income, were vitiated by subsequent regulations issued in 1968. Latham Park Manor, Inc. v. Commissioner, 69 T.C. 199, 215-216 (1977)(allocating interest income to two subsidiary corporations that made interest-free loans to their parent corporation, even though the parent corporation produced no income from the loan proceeds during the taxable years), affd. without published opinion 618 F.2d 100 (4th Cir. 1980). Accordingly, petitioners' reliance on Smith-Bridgman and similar cases is misplaced.

Moreover, we conclude that petitioners' argument that the inquiry should be limited to the actual amounts of fees or commissions that LTD itself earned is without merit. In addition to overcoming respondent's presumption of correctness, under the law applicable to this case, petitioners have the burden of proving satisfaction of the arm's-length standard. See Eli Lilly & Co. v. Commissioner, 856 F.2d 855, 860 (7th Cir. 1988), affg. in part and revg. in part 84 T.C. 996 (1985); Sundstrand Corp. & Subs. v. Commissioner, 96 T.C. 226, 354 (1991), affd. 17 F.3d 965 (7th Cir. 1994). If petitioners fail to carry that burden, the

Court must determine the proper allocation of items based upon the record. See Eli Lilly & Co. v. Commissioner, supra; Sundstrand Corp. & Subs. v. Commissioner, supra.

Accordingly, our task is to examine whether petitioners met the arm's-length standard. That standard is met by an arm's-length charge. Secs. 1.482-1(b), 1.482-2(b)(3), Income Tax Regs. An arm's-length charge is defined as "the amount which was charged or would have been charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all relevant facts." Sec. 1.482-2(b)(3), Income Tax Regs. Significantly, the regulations do not inquire into or limit the allocation to the taxpayer's actual earnings. As we found in our prior opinion, LTD's actual earnings include amounts which were charged to "related" or favored clients.[6] Consequently, as LTD's actual earnings include amounts that are less than arm's-length charges, the arm's-length standard found in the section 482 regulations is not limited by LTD's actual earnings.

---

[6] Moreover, we conclude that, in any case, the record does not establish LTD's "actual earnings" as to the Currency Fund and the FEIM Fund from which to make a comparison. According to the Deloitte workpapers, management fees as to both the Currency Fund and the FEIM Fund were charged by LTD against the funds themselves and were placed in the general category of Management Fees, not in the individual income categories for the Currency Fund and the FEIM Fund. After searching the record, we were unable to ascertain the precise amount of management fees attributable to the Currency Fund and the FEIM Fund.

Our inquiry is whether the fees paid by LTD to INC meet the standard of arm's-length charges within the meaning of section 1.482-2(b)(3), Income Tax Regs. In our prior opinion, we concluded that an arm's-length charge, within the meaning of section 1.482-2(b)(3), Income Tax Regs., for the services performed by INC on behalf of LTD was the amount that LTD charged its unrelated clients. Petitioners do not argue that INC rendered no services relating to the Currency Fund and the FEIM Fund during the taxable years in issue. After considering petitioners' arguments, we do not reconsider our holding in our prior opinion that the arm's-length charges for the services performed by INC on behalf of LTD are the amounts which LTD charged its unrelated clients. As the fees that INC reported as deriving from LTD were less than the arm's-length charges,[7] petitioners have not met the arm's-length standard.

We also find no merit in petitioners' argument that, because respondent's original section 482 allocations in the notice of deficiency used net amounts, we may only consider allocations based upon net amounts. Allocations based upon net amounts are not dispositive for purposes of the arm's-length framework provided by section 482 and the regulations thereunder.

_____

[7] As we stated, _supra_, petitioners did not establish the amounts that INC earned for each individual investment product. Consequently, for purposes of sec. 482, we compare LTD's annual payment to INC with the sum of the arm's-length charges calculated for the services INC rendered to LTD.

Moreover, we held in our prior opinion that respondent's allocations are arbitrary insofar as respondent failed to identify which activities of INC earned what revenue and failed to distinguish income earned by LTD from income earned by INC.

Petitioners argue that even an allocation of the net amount of revenues is "excessive" because INC only made "bookkeeping entries" and that the FEIM Fund allocation should be reduced to zero because INC's only role was to arrange for the transfer of client funds and to include a monthly statement of the client's share of the fund value. Notwithstanding petitioners' characterization of INC's services, INC did in fact render services to LTD related to the Currency Fund and the FEIM Fund. INC, as to both funds, inter alia, accepted clients' deposits and issued periodic statements to clients, and, as to the FEIM Fund, transferred clients' deposits to Merrill Lynch. As respondent determined that income should be allocated to INC pursuant to section 482, INC's true taxable income from its performance of such services must be ascertained; i.e., the taxable income that would have resulted to INC in an arm's-length transaction. See Altama Delta Corp. v. Commissioner, 104 T.C. 424, 456 (1995); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 164 (1994); Sundstrand Corp. & Subs. v. Commissioner, supra at 353. In our prior opinion, we held that, as to INC's income derived from rendering services to LTD related to the Currency Fund and the FEIM Fund, petitioners failed to meet the arm's-

length standard. After considering petitioners' arguments, we do not reconsider our holdings with respect to the section 482 allocations of income to INC.

2. Currency Exchange Transactions Income

As to the currency exchange transactions income, petitioners seek reconsideration of the section 482 allocations of LTD's gross receipts to INC. Petitioners contend that INC's contribution to the earning of currency exchange revenues was ministerial at best, as evidenced by the fact that the income was not a "fee" but rather a "spread". Additionally, petitioners argue that LTD's promoter in Mexico negotiated the exchange rate with his client, structured the exchange using a Mexican exchange house, and calculated and tracked LTD's spread, and, therefore, there is no basis in the record for our holding that "LTD paid INC to effect currency transactions". Petitioners argue that allocating the gross receipts overstates the value of INC's services to LTD and its promoters in Mexico and gives no credit to the role and contribution of the promoters. Accordingly, petitioners argue that the allocation should be based on a charge in the nature of a fixed, wire transfer fee that would normally be charged in carrying out the services INC "might be called upon to perform." We do not agree.

In our prior opinion, we found that clients paid LTD to arrange four types of currency transactions. We are satisfied that the record establishes that the currency transactions were

actually performed, sometimes in combination, by LTD, INC, the Guadalajara office, and the promoters. As respondent determined that income should be allocated to INC pursuant to section 482, INC's true taxable income from its performance of such services must be ascertained. The record, however, does not establish that clients made payments to each entity performing a service in the currency transaction; in other words, clients did not pay a separate fee to LTD, INC, the Guadalajara office, and the promoters.

Nonetheless, in our prior opinion, based upon information provided in the Deloitte workpapers, we excluded from the section 482 allocations the income earned from services performed by the Guadalajara office. We, however, did not exclude from the section 482 allocations any income earned from services performed by the promoters because petitioners did not provide any basis for apportioning such income. Additionally, the record did not provide sufficient information to establish a basis for apportionment on our own.

We disagree with the premise of petitioners' argument that LTD performed only one type of currency transaction for its clients. As discussed supra and in our prior opinion, LTD performed four types of currency transactions. Additionally, we find to be without merit petitioners' argument that INC's services were "ministerial". Notwithstanding petitioners' characterization of INC's services, INC did in fact render

services to LTD relating to currency exchange transactions, including, inter alia, contacting Bank of America and United States Trust to obtain exchange rates and to arrange the currency swaps, depositing or withdrawing dollars or pesos, and maintaining records of LTD's and its clients' positions with respect to the currency transactions. As respondent determined that income should be allocated to INC pursuant to section 482, INC's true taxable income from its performance of such services must be ascertained; i.e., the taxable income that would have resulted to INC in an arm's-length transaction. See Altama Delta Corp. v. Commissioner, supra; Seagate Tech., Inc. & Consol. Subs. v. Commissioner, supra; Sundstrand Corp. & Subs. v. Commissioner, supra.

Petitioners argue that we should "deduct" from the section 482 allocations we made in our prior opinion the income earned from services performed by the promoters in currency transaction type (i), in which LTD arranged sales of dollars to a client in exchange for pesos. As stated above, petitioners argue that an allocation of the gross receipts to INC gives no credit to the role and contribution of the promoters. Petitioners suggest a basis for apportionment in which INC is allocated only a charge in the nature of a fixed, wire transfer fee that would normally be charged in carrying out the services INC "might be called upon to perform." As stated above, we disagree with the premise of petitioners' argument that LTD performed only one type of

currency transaction for its clients. LTD engaged in four types of currency transactions. Moreover, petitioners do not point to any evidence in the record that would support petitioners' asserted basis for apportionment. Petitioners offered no proof at trial concerning the transfer fee that would "normally" be charged under such circumstances. Generally, we do not grant reconsideration to resolve issues which could have been raised during the prior proceedings because the parties cannot try their cases with hindsight. CWT Farms, Inc. v. Commissioner, 79 T.C. 1054, 1057 (1982), affd. 755 F.2d 790 (11th Cir. 1985), and cases cited therein. Accordingly, as to the currency exchange transactions income, we do not reconsider our holdings with respect to the section 482 allocations of income to INC.

3. Client Incorporation and Trust Creation Fees

Petitioners seek reconsideration of the section 482 allocations of LTD's income from client incorporation fees to INC. Petitioners argue that the payments to third party lawyers and fiduciaries are merely repayment of funds LTD advanced to the contract lawyers or professionals and should therefore be deducted in the calculation of the arm's-length fee for INC's services in connection with the client incorporation fees. Relying on respondent's original allocations in the notice of deficiency based on net amounts, petitioners contend that the section 482 allocations should be reduced by the "direct costs", which include the payments that LTD made to third party lawyers

and fiduciaries.  Additionally, petitioners seek to reduce the client incorporation fees to an amount that petitioners contend reflects INC's actual contribution to the receipts LTD earned; i.e., no more than a flat, nominal fee for each incorporation. We disagree.

In our prior opinion, we found that clients paid LTD to establish offshore corporations and trusts to hold their investments.  LTD charged its clients:[8]  (1) an "opening expense", which consisted of LTD's fee and fees for third party lawyers and fiduciaries, and (2) an "annual expense".  The record establishes that the creation of those offshore corporations and trusts included the performance of services by INC as well as by third party lawyers and fiduciaries.  On behalf of LTD, INC managed the paperwork for establishing and maintaining the offshore corporations and trusts while the third party lawyers and fiduciaries created the offshore corporations and trusts.

We disagree with petitioners' argument that LTD's payments to third party lawyers and fiduciaries should be "deducted" from LTD's gross receipts in deciding the arm's-length fees for INC's services.  An arm's-length charge within the meaning of section 1.482-2(b)(3), Income Tax Regs., is an "amount which was charged or would have been charged for the same or similar services in

---

[8]    As we noted supra and in our prior opinion, the record reveals instances in which LTD dealt with "related" or favored clients who were charged lower or no fees.

independent transactions with or between unrelated parties under similar circumstances considering all relevant facts."

As to INC's services in establishing and maintaining the offshore corporations and trusts, petitioners did not establish an arm's-length charge for such services. Petitioners also did not offer any evidence establishing the amounts received and paid by LTD for services performed by third party lawyers and fiduciaries. Moreover, petitioners did not offer a methodology for apportioning or attributing income between the services performed by INC and the services performed by the third party lawyers and fiduciaries. Furthermore, the record does not provide sufficient information to establish on our own the amount of income that should be apportioned to each source.[9] Consequently, we do not reconsider our holding in our prior opinion where we allocated income as to the client incorporation and trust creation fees from LTD to INC.

Finally, we reject petitioners' contention that the client incorporation fees should be apportioned so that INC receives no more than a flat, nominal fee for each incorporation. The record

---

[9]    As to client incorporations, the record contains LTD's charges for opening expenses and annual expenses. The record, however, does not contain LTD's charges for third party lawyers and fiduciaries or the number of incorporations that LTD performed for its clients during each taxable year. The record does contain LTD's charges for opening costs, annual costs, and lawyers' costs for the creation of client trusts; however, it does not contain the number of trusts that LTD created for its clients during each taxable year.

does not contain any evidence of what such a fee might be.
Moreover, petitioners' apportionment methodology is an argument
which could have been made before the filing of our prior
opinion.[10]  Generally, we do not grant reconsideration to resolve
issues which could have been raised during the prior proceedings
because the parties cannot try their cases with hindsight.  CWT
Farms, Inc. v. Commissioner, supra.  Consequently, as to the
client incorporation fees, apart from the correction of a
computational error,[11] we do not reconsider our holdings with
respect to the section 482 allocations of income to INC.

On a final note regarding the section 482 allocations, we
are satisfied that, even if LTD were entitled to deduct (1) the
section 482 allocations of income to INC as additional
compensation expenses (we address such correlative adjustments to
LTD's income, infra), (2) its direct costs (except for the
interest amounts in the "Interest Income" category, which have
already been excluded in our prior opinion), and (3) the
compensation expenses for the fees already paid to INC, LTD would
nevertheless have an excess of income over expenses for each of

---

[10]    As we stated, supra, petitioners did not provide an
apportionment methodology in the first proceeding, and the record
did not provide sufficient information to establish an
apportionment methodology of our own.

[11]    The amount of LTD's revenues from "Client incorporation and
trust creation fees" during taxable year ended June 30, 1986, on
page 213 of our prior opinion should be changed from $169,263 to
$147,951.

the taxable years in issue.  As discussed in our prior opinion, LTD earned income by retaining the difference between the interest that it obtained on client investments and the interest that it credited to client accounts,[12] which we characterized as compensation for services.  LTD received such service income in addition to the management fee or commission that it charged its clients for a particular investment.  In sum, we do not reconsider any of the section 482 allocations of income to INC, which, as to LTD, take the form of additional compensation expenses.

E.   Section 482 Correlative Adjustments

Petitioners' motion requests that we reconsider our holding in our prior opinion that LTD is not entitled to a correlative adjustment, pursuant to section 1.482-1(d)(2), Income Tax Regs.,[13] once a primary adjustment is made to INC's income.

---

[12]   As we found in our prior opinion, during 1986, the discretionary authorization signed by each LTD client was changed to include the provision that

> The rate of return credited to the Client's account may not reflect directly the rate of return earned by specific investments; the Client's rate of return may be net of expenses or may reflect the fact that * * * [LTD] may retain the benefit of special rates attributable to the volume of investments controlled by * * * [LTD].

[13]   Section 1.482-1(d)(2), Income Tax Regs., provides:

> Whenever the district director makes adjustments to the income of one member of a group of controlled taxpayers (such adjustments being referred to in this
> (continued...)

Petitioners contend that the regulations provide that, if primary adjustments are made to the income of one member of the group, correlative adjustments shall be made to the other member "in all circumstances", subject to the pending year requirement. Additionally, petitioners argue that the regulations absolutely mandate that, when the income of one member of the group is increased, the correlative adjustment "shall actually be made" and the district director "shall decrease the income of the other member".  Finally, citing Collins Elec. Co. v. Commissioner, 67 T.C. 911, 923-924 (1977), petitioners argue that correlative

---

[13](...continued)
paragraph as "primary" adjustments) he shall also make appropriate correlative adjustments to the income of any other member of the group involved in the allocation.  The correlative adjustment shall actually be made if the United States income tax liability of the other member would be affected for any pending taxable year.  Thus, if the district director makes an allocation of income, he shall not only increase the income of one member of the group, but shall decrease the income of the other member if such adjustment would have an effect on the United States income tax liability of the other member for any pending taxable year.  * * *  If a correlative adjustment is not actually made because it would have no effect on the United States income tax liability of the other member involved in the allocation for any pending taxable year, such adjustment shall nevertheless be deemed to have been made for the purpose of determining the United States income tax liability of such member for a later taxable year, or for the purposes of determining the United States income tax liability of any person for any taxable year.  The district director shall furnish to the taxpayer with respect to which the primary adjustment is made a written statement of the amount and nature of the correlative adjustment which is deemed to have been made.

adjustments are necessary to avoid multiple taxation of the same income.

Petitioners' argument that the regulations provide for a correlative adjustment "in all circumstances" is without merit. Section 1.482-1(d)(2), Income Tax Regs., provides that the district director, whenever making primary adjustments, "shall also make appropriate correlative adjustments". (Emphasis added.) We believe that the term "appropriate" serves to limit the application of a correlative adjustment so that a correlative adjustment is not made "in all circumstances", but, rather, only when "appropriate". Sec. 1.482-1(d)(2), Income Tax Regs. Additionally, section 1.482-1(d)(1), Income Tax Regs., which addresses all section 482 adjustments (as opposed to section 1.482-1(d)(2), Income Tax Regs., which addresses only primary and correlative adjustments), requires that all adjustments be "appropriate".[14]

---

[14] Section 1.482-1(d)(1), Income Tax Regs., provides:

The method of allocating, apportioning, or distributing income, deductions, credits, and allowances to be used by the district director in any case, including the form of the adjustments and the character and source of amounts allocated, shall be determined with reference to the substance of the particular transactions or arrangements which result in the avoidance of taxes or the failure to clearly reflect income. The appropriate adjustments may take the form of an increase or decrease in gross income, increase or decrease in deductions (including depreciation), increase or decrease in basis of assets (including inventory), or any other adjustment which

(continued...)

In the instant case, for the taxable years in issue, LTD failed to file timely, true, and accurate returns pursuant to section 882(c)(2).  In our prior opinion, we held that, consistent with Blenheim Co. v. Commissioner, 125 F.2d 906 (4th Cir. 1942), and Georday Enters., Ltd. v. Commissioner, 126 F.2d 384 (4th Cir. 1942), LTD is precluded from receiving the benefits of any deductions that it might have otherwise been entitled to claim pursuant to section 882(c)(1)(A) had it filed a timely, true, and accurate return pursuant to section 882(c)(2).  See Espinosa v. Commissioner, 107 T.C. 146 (1996).  In the instant case, the form of the section 482 correlative adjustment to LTD's income would be an increase in the amount that LTD would be entitled to deduct pursuant to section 882(c)(1)(A).  In our prior opinion, however, we concluded that, because LTD failed to file timely, true, and accurate returns pursuant to section 882(c)(2), correlative adjustments to LTD's income, which take the form of deductions pursuant to section 882(c)(1)(A), were not appropriate for the taxable years in issue.

In their motion, petitioners elaborate on the argument which they made on brief regarding the correlative adjustments and contend that the regulations absolutely mandate that, when the income of one member of the group is increased, the correlative

---

14(...continued)
    may be appropriate under the circumstances.  [Emphasis added.]

adjustment "shall actually be made" and the district director "shall decrease the income of the other member".  We believe that petitioners' argument fails to appreciate the procedure regarding correlative adjustments set forth in the regulations. Accordingly, we believe that it would be helpful to expand upon what we stated in our prior opinion.

Section 1.482-1(d)(2), Income Tax Regs., provides that, in the event that an appropriate correlative adjustment is made by the district director, it shall be treated in one of two alternative ways:  The correlative adjustment either (1) shall actually be made or (2) shall be deemed to have been made.  The proper treatment of a correlative adjustment, if one is made by the district director, depends on whether or not the U.S. income tax liability of the "other member" of the group of controlled taxpayers involved in the allocation (i.e., the taxpayer entitled to receive an appropriate correlative adjustment) would be affected for any pending taxable year.

The regulations provide that, in the event that an appropriate correlative adjustment is made by the district director, if the U.S. income tax liability of the other member would be affected for any pending taxable year, "The correlative adjustment shall actually be made."  Sec. 1.482-1(d)(2), Income Tax Regs.  Alternatively, the regulations provide that, in the event that an appropriate correlative adjustment is made by the district director, if the U.S. income tax liability of the other

member <u>would not</u> be affected for any pending taxable year and the correlative adjustment is therefore not actually made, "such adjustment shall nevertheless be deemed to have been made" for purposes of determining the other member's U.S. income tax liability for a later taxable year or for purposes of determining any other person's U.S. income tax liability for any taxable year. <u>Id.</u>

Accordingly, the regulations provide that an appropriate correlative adjustment, if one is made by the district director, either "shall actually be made" or "shall nevertheless be deemed to have been made". <u>Id.</u> In that context, the phrase, "The correlative adjustment shall actually be made", is merely a description of the result that occurs when the district director makes an appropriate correlative adjustment and the U.S. income tax liability of the other member <u>would</u> be affected for any pending taxable year, as opposed to a correlative adjustment that is deemed to have been made. The phrase "shall actually be made", therefore, does not mandate that a correlative adjustment always be made but, rather, serves only to describe one of the two alternative ways of treating an appropriate correlative adjustment, if one is made by the district director.

Accordingly, we note that the language, "Thus, if the district director makes an allocation of income, he shall not only increase the income of one member of the group, but shall decrease the income of the other member", appears in the sentence

immediately after the one providing the conditions under which a correlative adjustment "shall actually be made".  In that context, the language merely describes the steps to be taken when an appropriate correlative adjustment is "actually" being made. Accordingly, we conclude that the phrase "shall decrease the income of the other member" only applies when the district director, after deciding that a correlative adjustment is appropriate under the circumstances, "actually" makes the correlative adjustment; such language does not mandate that the district director, when increasing the income of one member of the group, must always decrease the income of the other member.

As we held supra and in our prior opinion that LTD is not entitled to deduct the section 482 allocations of income to INC as additional compensation expenses because LTD failed to file timely, true, and accurate returns pursuant to section 882(c)(2), we conclude that correlative adjustments are not appropriate under the circumstances of the instant case.

In our prior opinion, we addressed petitioners' argument regarding double taxation and distinguished Collins Elec. Co. v. Commissioner, 67 T.C. 911 (1977).  Accordingly, we do not reconsider our holding that LTD is not entitled to correlative adjustments pursuant to section 1.482-1(d)(2), Income Tax Regs., for the taxable years in issue.

F.    Additions to Tax

In their motion, petitioners elaborate on the arguments which they made on brief regarding the additions to tax assessed against INC and Holdings pursuant to sections 6653 and 6661. Generally, we do not grant reconsideration to resolve arguments which could have been raised during the prior proceedings. CWT Farms, Inc. v. Commissioner, 79 T.C. at 1057. Consequently, we do not reconsider our holdings in our prior opinion sustaining respondent's determination of additions to tax for INC and Holdings pursuant to sections 6653 and 6661.

We have considered all of the remaining arguments made by petitioners in their motion and find such arguments to be without merit.[15]  To reflect the foregoing,

Appropriate orders

will be issued.

---

[15]    Although not raised by the parties, paragraphs numbered 3 and 4 on page 10, paragraph numbered 3.b. on page 221, and paragraph numbered 3.c. on page 222 in our prior opinion were unnecessary because the matters covered by those paragraphs were covered by the parties in their stipulation and did not require a decision by the Court. Consequently, in our order to be issued pursuant to this opinion, we will delete those paragraphs from our prior opinion.